2018 IL App (3d) 140660

Opinion filed August 20, 2018

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Whiteside County, Illinois. |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-14-0660 |
| v. | ) ) | Circuit No. 13-CM-121 |
| DEVIN M. KOCHEVAR, | ) ) ) | The Honorable Michael R. Albert, Judge, presiding. |
| Defendant-Appellant. | ) | |

JUSTICE McDADE delivered the judgment of the court, with opinion.
Presiding Justice Carter and Justice Lytton concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Devin M. Kochevar, was charged by information with one count of criminal

sexual abuse (720 ILCS 5/11-1.50(c) (West 2012)). He filed a motion to suppress the statement

he had made during a custodial interview with regard to the alleged abuse, which was denied.

The case was tried to a jury and Kochevar was found guilty. He was sentenced to serve 90 days

of jail time with all but 10 days suspended and 24 months of probation, and he was required to

register as a sex offender, undergo sex offender treatment and aftercare, provide a DNA sample,

and pay a variety of fines and fees. He appealed, challenging the denial of his motion to suppress

his custodial statement as involuntarily procured and seeking reversal of his conviction and new proceedings. During the pendency of the appeal, a different and divided panel of this court issued a decision in *People v. Tetter*, 2018 IL App (3d) 150243. Thereafter, Kochevar sought and was given leave to add a second issue to his direct appeal premised on the *Tetter* decision. We ordered supplemental briefing, which is now completed. This opinion addresses both issues he has raised. We vacate the portion of Kochevar's sentence requiring him to register as a sex offender and remand this matter to the circuit court of Whiteside County for entry of a new sentencing order consistent with this decision.

¶ 2                                                    FACTS

¶ 3        There is no report of proceedings of either the suppression hearing or the trial in the record. There is also no written order documenting the trial court's decision on the motion to suppress but there is a docket entry. There is no written order explaining the trial court's finding that the statement was voluntary and denying the motion to suppress. At the time appellant's original brief was filed, an "Agreed Statement of Facts" had been filed as a supplement to the common law record. Before submitting its appellee's brief, the State secured a "Supplemental Agreed Statement of Facts," which focused on the attorneys' accounts of Kochevar's testimony at the suppression hearing. The balance of the record consists of a one-volume common law record, which includes a sexual assessment by Kirk Witherspoon, the two-part document signed by Kochevar, and his birth certificate. The following statement of facts was derived from those documents and the parties' briefs.

¶ 4        Kochevar and C.R. had been acquainted for several years through their participation in track. In 2012, when he was 16 (nearly 17) and C.R. was 14, the relationship grew closer. After Kochevar turned 18, their relationship became sexual. Both were attending Prophetstown High

2

School. On March 16, 2013, upon learning of this relationship and the couple's alleged sexual activities the preceding night, C.R.'s parents called the police.

¶ 5 Two days later, Chief Michael Fisk and Sergeant Bruce Franks of the Prophetstown Police Department went to the high school and met with Kochevar in the school office. The officers asked him to go with them to the police station to give a statement regarding his relationship with C.R. Kochevar readily agreed and was driven to the station, uncuffed, in Franks's marked police car.

¶ 6 Once there, Kochevar was escorted directly to an interview room and was questioned by Franks and Fisk. After about 20 minutes, Kochevar gave an oral statement, which is not preserved in either audio or video form in the record. He then agreed to prepare a written statement, which he composed and signed while alone in the interview room. Thereafter, the interview apparently resumed in the form of a series of written questions set out at the end of Kochevar's signed statement. He answered those questions in writing and signed them. Neither part of the document was prepared or signed under oath. This two-part document reads as follows:

> "Right around a year ago, C.R. & I started talking. We were friends & neither one of us thought anything more would come of it. But C.R. & I talked a lot & started to like each other. When this first started I was 17 and she was 15. Or maybe I was about a month or so over 17. Either way, it was a two year difference. But C.R. & I would have never been aloud [*sic*] to see each other because a little over a year ago, me & some of my friends threw eggs at her house & her sister's car because we

3

didn't like her. Honestly, I regret that. It was a mistake I had to learn from. My car was egged & then I knew how it felt & it made me feel worse about it. But anyways, that's why we wouldn't be aloud [*sic*] to be friends or anything like that. But neither one of us cared, we wanted to see each other so we made it work. Occasionaly [*sic*] C.R. would sneak out to see me. Sometimes we would just drive around & other times we would go to my house. Our relationship didn't start out sexual. Honestly for the longest time we did no more than kiss. But eventually that changed & things became more than that. Yes, we did have sex, I won't deny that. But never did I force her. No matter how bad I wanted to do anything, I didn't do it unless she wanted to too. I'm not that kind of guy. Even after this I wouldn't say that I'm a 'bad guy.' Sure I make mistakes, I'm human but I think I'm an alright guy. I mean I always go to school, I get good grades. I'm a 3 sport athlete who excels in all of them. I've accepted an offer from Monmouth College to play basketball & run track for them on a scholarship. I actually plan to major in business and music so I can open up a place for kids, singers, or bands to come record music. That's my big plan. If I had to say one more thing about myself, I guess I would mention [*signature at end of first page*] Drake. Drake is a young man on the Comanche track team. Drake throws shot & runs the short sprints. Drake isn't good at those things but he gives it his

4

all. So one meet last year after I had one [*sic*] the fastest heat of the 200, I asked the official if I could run it again. This time with Drake. He shook my hand & smiled then told me I could. So I ran that second 200. I ran it right behind Drake. I ran it and I lost. To a kid in a wheelchair. Drake competes with able bodied athletes even though he has never walked. Winning wasn't something he had experienced. So I cried my eyes out as I ran that race with him. It broke my heart. I talked with Drake & his parents & I ended up coming to another one of his meets & running with him again. To this day he & I remain friends. We always will be. But I'm not trying to sell anyone a sob story or convince you that I'm perfect. I wouldn't be writing this if that was the case. I understand how my relationship with C.R. was wrong. I understand why her parents are extremely upset. I would probably feel about the same way they do. Maybe they will get to read this & maybe they won't but I want to say that I'm sorry. I'm sorry for the past we have had & I'm sorry for this. But I can't say I wish it never happened. There is a big spot for that girl in my heart & I think there always will be. We have so much in common its [*sic*] crazy. Yes, she is a little younger than me, but we still click. Will I end up with C.R.? Who knows, maybe & maybe not. Obviously some people might not like that but as long as she is happy, I'm happy. If she never wants to speak to me again or even wants to wait & see what happens

when she is 18, I'm okay with whatever. As long as she is happy. I'm very sorry that any of this ever had to happen. I should have used my head more. But like I said, I'm only human. So hopefully this can all get worked out as easily as possible so we [*signature at end of second page*] can move forward with our lives & get back on track. Thank you for taking the time to read what I had to say about this matter. I appreciate it. Sincerely, [*signature at end of handwritten statement*].

Q. HOW OLD IS C*** R***?

A. 15

Q. HOW MANY TIMES HAVE YOU HAD SEX WITH C*** R*** AT AGE 17?

A. 0

Q. HOW MANY TIMES AT AGE 18 DID YOU HAVE SEX WITH C*** R***?

A. 20-30 times maybe

Q. WHEN IS THE LAST TIME YOU HAD SEX WITH C*** R*** ?

A. 3/15/13

Q. WHERE DID THE SEX OCCUR THE LAST TIME?

A. My house (320 Woodlawn Drive)

Q. DID YOU EVER FORCE HER TO HAVE SEX?

A. No

Q. DID YOU GIVE HER ALCOHOL OR DRUGS FOR

SEX?

A. No

Q. DID YOU VIOLATE ANY LAW WITH YOUR

RELATIONSHIP WITH C*** R***, IF SO WHAT LAW?

A. I don't think I did mainly because she was all for it &

we didn't drink or do drugs or anything like that. But the age thing

plays a part. [*signature at end of questions*]"

After Kochevar signed the last part of the document, the officers took him back to school.

¶ 7        About three weeks later, on April 13, 2013, Kochevar was charged by information[1] with one count of misdemeanor criminal sexual abuse. The count alleged that on March 15, 2013, he committed an act of sexual penetration with C.R., who was at least 13 but under 17 years of age and he was less than 5 years older than C.R.

¶ 8        Kochevar filed a motion to suppress his custodial statement, arguing that it was made involuntarily. He claimed that during the interview, Franks and Fisk, both of whom he had known personally since boyhood, repeatedly told him "they already knew the truth," he "had to" give a statement before he left the station, and that the state's attorney would go easy on him if he admitted the truth in a written statement. Through counsel, he asserted that the officers exploited their personal relationships with him to secure the statement.

¶ 9        A hearing was held on the motion. Kochevar testified that prior to the commencement of the police interview he was given his *Miranda* rights, orally and in writing on a preprinted rights

---

[1]The information originally listed Kochevar as "Devin M. Johnson" because he had unofficially adopted the last name of his stepfather. An amended information using Kochevar's legal name was filed on April 19, 2013.

waiver form. He signed the preprinted form and did not ask to leave or for an attorney at any time during the interview. He testified that he had no difficulty understanding the officers' questions during the interview and that he had not been upset or crying. He stated that his academic performance at school was typical and that he did not have any learning disabilities or other intellectual impairments when the officers questioned him. He initially asserted that the interview lasted for "over an hour," but later amended that, saying it could have been less than an hour because when he was returned to school classes were still in session and it was still daylight. The record confirms that he was, in fact, at the station for about an hour.

¶ 10    Kochevar further testified that he knew Franks and Fisk personally. He had known Fisk, who was a family friend, since childhood. Franks had coached him in youth football and baseball and was also a friend of his father. He viewed the officers as people he was friendly with and he trusted. He opined that both officers spoke to him in a friendly manner and not "like cops." They did not speak aggressively, use profanity, or raise their voices. He affirmed that no physical coercion was used during the interview but testified that one of the officers told him he "had to" give a statement before he left. They gave him the impression that his giving a statement would cause the State to "take it easy" on him.

¶ 11    Kochevar testified that he told the officers that he had sex with C.R. but that he had done nothing wrong. He said that he insisted during the interview—as he did at the hearing—that it was all consensual. He confirmed that he was alone when he wrote the statement that the State submitted as evidence during the suppression hearing.

¶ 12    Franks and Fisk also testified. They both confirmed that Kochevar was brought to the station, informed of his *Miranda* rights, signed the *Miranda* rights waiver, and then promptly admitted to having had consensual sex with C.R. Franks stated Kochevar gave no sign of

8

knowing what the officers wanted to talk about when they met him at the school. He denied promising the State would be lenient with him if Kochevar gave them a written statement but acknowledged telling him that he "needed to" make a statement before he left. Franks denied having a "mentor" relationship with or being particularly close to Kochevar. He did, however, confirm that he had been his coach for youth sports and opined that it would be fair to say that they were "friends." The record is silent as to any testimony of Fisk confirming or denying the claimed relationship with Kochevar.

¶ 13      The trial court ultimately denied Kochevar's motion to suppress and the matter proceeded to a jury trial. The State called only two witnesses, Sergeant Franks and C.R. Kochevar made a continuing objection to the introduction of evidence of or concerning his verbal and written statements on the grounds set forth in the motion to suppress. Franks testified about the events leading up to Kochevar's interview and the subsequent charges. His testimony included a recitation of what occurred during Kochevar's interview and was substantially similar in all salient respects to that he gave during the suppression hearing. Kochevar's handwritten statement with his answers to the additional tacked-on questions and his signed *Miranda* waiver were entered into evidence.

¶ 14      C.R. testified that on the night of March 15, 2013, she had sex with Kochevar. At the time, she was 15 years old and he was 18. During cross examination, Kochevar attempted to impeach C.R.'s credibility on the number of sexual incidents and to establish racial animus of her parents as motivation for his prosecution. He tendered offers of proof on both issues, but the State's relevance objections were sustained.

¶ 15    Kochevar's birth certificate documenting his birth on September 27, 1994, was admitted into evidence. The State rested. Kochevar's motion for a directed verdict was denied, and the defense rested.

¶ 16    During deliberations, the jury inquired about the existence of "an audio or video recording of [Kochevar's] questioning and interview and waiving of his rights." The court, after consulting the attorneys for both parties, advised the jurors that they would need to make the decision based on the evidence presented to them and the instructions they had been given.

¶ 17    The jury found Kochevar guilty of one count of criminal sexual abuse.[2] The trial court denied his motion for a new trial, which had alleged, among other issues, that his interview statement was involuntary and should have been suppressed. He was sentenced to 24 months' probation and required to register as a sex offender and undergo sex offender treatment and aftercare.

¶ 18                                    ANALYSIS

¶ 19                        I. Voluntariness of Custodial Statements

¶ 20    Kochevar initially argues here on appeal that the trial court erred in not suppressing his custodial statements because they were involuntarily given. He asserts that he had a long-standing personal relationship with each of the officers that led him to trust that they would treat him fairly, but they did not. Rather, he claims, they used that trust, his youth, and his lack of any experience with the criminal justice system to create a deceptively benign environment that, together with a promise of leniency and a failure to tell him what was criminal about his conduct, coerced his involuntary, unwitting admission to an undisclosed, undefined crime.

---

[2]After the verdict was entered, one of the jurors sent a letter to the trial judge saying the verdict was correct but urging him to be lenient in sentencing.

¶ 21    The State counters that the trial court was correct in finding that the interview, even with the existence of any personal relationships, was not coercive and the statement should not be suppressed. It points out that throughout the encounter the officers did not act in an intimidating or abusive manner or use any coercive physical tactics. The State further argues that Kochevar, who was 18 years old at the time of the interview, possessed the intelligence and education to understand the nature and purpose of his presence at the station, to make a rational decision to waive his *Miranda* rights, and to deny wrongdoing with respect to C.R.

¶ 22    At all times throughout the hearing on a motion to suppress a challenged statement, the State bears the burden of proof, but there is a shifting burden of production. Once the State has made a *prima facie* showing that the statement was voluntary, the burden shifts to the defendant to present some evidence that it was involuntary. If he does so, it remains for the State to prove by a preponderance of the evidence, considered in the light most favorable to the defendant (*People v. Tanser*, 75 Ill. App. 3d 482, 486 (1979) (citing *People v. Ruegger*, 32 Ill. App. 3d 765, 771 (1975))),[3] that the statement was, in fact, voluntary. *People v. Richardson*, 234 Ill. 2d 233, 254 (2009).

¶ 23    On review, a trial court's factual findings following a hearing on a motion to suppress a defendant's inculpatory statement will not be disturbed unless they are against the manifest weight of the evidence. *People v. Murdock*, 2012 IL 112362, ¶ 29. However, its ultimate ruling on whether the statement was made voluntarily is reviewed *de novo*. *Id.*

---

[3]*Ruegger* cited no authority for the principle that the evidence must be considered in the light most favorable to the defendant. In *People v. Wipfler*, 68 Ill. 2d 158, 173-74 (1977), the supreme court considered *Ruegger* in its evaluation of the voluntariness of the statement of another 18-year-old and neither questioned nor rejected that court's statement that the evidence is viewed in the light most favorable to the defendant. Indeed, there is no reason to do so as this perspective is consistent with a defendant's presumption of innocence.

¶ 24    The basic test for determining whether a statement is voluntary was set out by the supreme court in *People v. Prim*, 53 Ill. 2d 62, 70 (1972), as follows:

> "Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. [Citation.] In making its decision the trial court need not be convinced beyond a reasonable doubt, and the finding of the trial court that the statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence."

¶ 25    In more recent decisions, the supreme court has given us a more specific set of factors to be considered in assessing the voluntariness of a statement/confession. These include (1) the presence of *Miranda* warnings; (2) the defendant's personal characteristics including his age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning; (3) the legality and duration of the detention and questioning; (4) the conditions of detention; and (5) whether any threats, promises, deception, guilt, or other coercive tactics were used in inducing the confession. *People v. Slater*, 228 Ill. 2d 137, 160 (2008); *People v. Gilliam*, 172 Ill. 2d 484, 500-01 (1996); *People v. Martin*, 102 Ill. 2d 412, 426-27 (1984). In the instant case, Kochevar relies on the fifth factor.

¶ 26    The record shows, and the parties agree, that at the time of the interview Kochevar was an 18-year-old high school senior of average or better intelligence. He was given *Miranda* warnings orally and in writing and he does not deny having waived those rights by signing the preprinted waiver form. In addition, he and the officers agree that he did not cry or otherwise

12

exhibit any emotional distress during the interview. Kochevar does not claim that the officers at any time used abusive, profane, or intimidating language or physical tactics in an effort to elicit an inculpatory statement or that they denied him his rights to an attorney, to remain silent, or to end the interview. To the contrary, he was brought to the police station voluntarily and free of handcuffs. He described the conduct of the officers as friendly and "not like cops." The interview lasted less than an hour, and he was returned to school before the end of classes. The State rightfully points out that these concessions would normally support a finding that there was no coercion and the challenged statements were voluntary.

¶ 27        Kochevar, however, is claiming an entirely different form of coercion. He argues that he was subtly coerced by a combination of promises, omissions, and deception on the part of people with whom he had personal relationships and whom he trusted to deal with him fairly. He claims that that combination of factors, along with his youth and unfamiliarity with the criminal justice system, allowed the officers to extort statements from him that were incriminating and inculpatory. Kochevar's basic argument is that the same factors relied on by the State to prove there was no coercion, viewed in tandem with the personal relationships, actually prove his claim of a subtle, deceptive coercion.

¶ 28        More particularly he argues in this appeal that (1) the officers, whom he had known personally since childhood and whom he trusted, asked him to come to the police station and give a statement regarding his relationship with C.R.; (2) they did not tell him at that time that they were investigating his conduct as a crime; (3) they did not tell him that his conduct was criminal or why; (4) they did not handcuff him (but they were in uniform and he was transported in a marked police vehicle); (5) they did not act "like cops" but acted friendly; (6) they were the only people who interviewed him; (7) they told him they already knew the truth; and (8) they

13

told him he "had to" make a statement before he left, letting him know he *would* be leaving. None of these arguments is disputed or refuted anywhere in the record.

¶ 29 Kochevar also claims the officers told him the state's attorney would go easy on him if he prepared a written statement setting out the truth. This claim that he was promised leniency was denied by the officers and was clearly in dispute.

¶ 30 Kochevar and the officers agree that he composed the statement on his own while he was alone in the interview room. It has been quoted above in its entirety and is a remarkable "confession." It is chatty, discursive, and rife with information wholly irrelevant to his sexual conduct mixed in with facts about his relationship with C.R. He acknowledges doing something "wrong" but not something criminal. On the chance that they may see it, he apologizes for "upsetting" C.R.'s parents. He regrets not using his head. He thanks (presumably the state's attorney) for taking the time to read what he has to say and expresses his appreciation. He signs it "sincerely" followed by his name. The document does not read like a confession. It is, on the contrary, strongly suggestive of a letter candidly setting out both his strengths and flaws in an effort to convince the reader/recipient that he is essentially a good person—not perfect but deserving of the leniency he claims he was promised could be his.

¶ 31 Importantly, the document evidences no clear understanding of the actual nature of his putative crime. This fact is driven home by the series of questions and answers appearing below the signed handwritten statement. Although there is nothing in the record about how and why this addendum was created, we can reasonably infer that Franks and/or Fisk read the statement, realized the necessary admissions had not been specifically and clearly articulated, and prepared the questions to fill in the blanks.

¶ 32     According to paragraph 8 of the "Agreed Statement of Facts," Judge Carol Pentuic[4] presided over the suppression hearing and made the followings findings:

> "In her verbal ruling denying the Defendant's Motion to Suppress Statements, [the trial judge] found that the Defendant's waiver of *Miranda* was knowing and voluntary. Likewise, [the trial judge] rejected Defendant's argument that the officers' prior relationship with Defendant was such a position of trust and authority so as to render their influence over Defendant coercive."

¶ 33     Kochevar has raised no challenge to the voluntariness of the *Miranda* waiver, and we do not consider that portion of the court's decision. He does, however, contest the factual finding about the prior relationships. The court's finding could be correct as far as it goes, but it is incomplete. As the supreme court explained in *Wipfler*, "the relationship of an interrogator to a party being questioned is a relevant consideration in assessing a statement's voluntariness." *Wipfler*, 68 Ill. 2d at 173. The court had made it clear, however, that voluntariness depends on the totality of the circumstances. *Id.* at 172-73. Other relevant factors to be weighed include the alleged promise of leniency, the exhortation to tell the truth, the alleged failure to define the crime being investigated, the "friendliness" that supplanted what Kochevar thought might be typical police conduct during interrogations, and Kochevar's youth and unfamiliarity and lack of experience with the criminal justice system. See *id.* at 174.

¶ 34     There is no evidence of record that the trial court considered any factor other than the personal relationships themselves in concluding there was no coercion or coercive influence.

---

[4]After the suppression hearing, Judge Michael Albert presided over the remainder of the proceedings.

15

¶ 35    Viewing the totality of the evidence in the light most favorable to Kochevar, it seems likely that the inculpatory statements were given to earn leniency allegedly promised by persons he trusted and believed and not as a knowing admission, willingly given, of criminal wrongdoing. Although we understand that the overall circumstances may well have misled Kochevar about the gravity of the conduct to which he was admitting, we cannot find on this record that the conduct of the officers was coercive or that the "confession" was coerced.

¶ 36    We also note that the "confession" was unnecessary to his conviction and any questions about the manner in which it was secured are essentially irrelevant. All that is necessary to sustain Kochevar's conviction is his acknowledgement that he had a sexual encounter with C.R. when he was 18 and she was 15. See generally *People v. Lloyd*, 2013 IL 113510, ¶¶ 27-30; *People v. Lloyd*, 2011 IL App (4th) 100094, ¶¶ 55-60, (Steigmann, J., specially concurring in part and dissenting in part). That information was true, was provided freely to Franks and Fisk during the interview and in Kochevar's written statement, and was proven at trial through the testimony of C.R. and the admission of Kochevar's birth certificate.

¶ 37    Kochevar's challenge to his conviction on the grounds that his custodial statement was coercively procured and, therefore involuntary, must fail.

¶ 38                    II.    As-Applied Constitutional Challenge

¶ 39    We next consider Kochevar's constitutional challenge alleging the "Illinois statutory scheme of penalties that apply to a convicted sex offender, including community notification, and, *inter alia*, restrictions on movement and employment are unconstitutional as applied to him." He cites the following offending statutes: the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2016)), Sex Offender Community Notification Law (Notification Law) (730 ILCS 152/101 *et seq.* (West 2016)), section 11-9.3 of the Criminal Code of 2012 (720 ILCS

16

5/11-9.3 (West 2016)), section 5-5-3(o) of the Unified Code of Corrections (730 ILCS 5/5-5-3(o) (West 2016)), and section 21-101 of the Code of Civil Procedure (735 ILCS 5/21-101 (West 2016)).

¶ 40    Kochevar's as-applied challenge rests on two arguments: first, that, relying on *Tetter*, 2018 IL App (3d) 150243, the restrictions constitute punishment and their application to him renders that punishment grossly disproportionate to the severity of the crime in violation of the eighth amendment to the United States Constitution (U.S. Const., amend. VIII); and, second, again relying on *Tetter*, the restrictions constitute a "penalty" and their application to him violates the clause of the Illinois Constitution requiring "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

¶ 41    As previously noted, this issue is raised pursuant to leave given by this court for defendant to add the issue to his appeal. The State does not challenge the timeliness of Kochevar's constitutional claim, so we merely note for the record that several decisions of the appellate court have held that the failure to raise an "as applied" constitutional claim at trial or in a posttrial motion does not result in forfeiture. *Tetter*, 2018 IL App (3d) 150243, ¶ 36; *People v. Burnett*, 2015 IL App (1st) 133610, ¶¶ 81-82; *People v. Cleary*, 2013 IL App (3d) 110610, ¶ 35; *People v. Emmett*, 264 Ill. App. 3d 296, 297 (1994). We agree with those decisions. We also note that the evidence in the record is more than ample to allow us to review Kochevar's claim that the sex offender statutory scheme is unconstitutional as it applies to him.

¶ 42                                    A. Defendant

¶ 43    We begin our analysis by considering who Kochevar was at the time he committed and was convicted for his offense. We derive this information from the custodial statement quoted

17

earlier in this opinion. He was a senior at Prophetstown High School whose positive academic and athletic performances earned him admission to Monmouth College and an athletic scholarship to play basketball and run track. He said of his academics, "I always go to school, I get good grades." He planned to study business and music in college and his "big plan" for his life was to "open up a place for kids, singers, or bands to come record music."

¶ 44        He described himself as "a 3 sport athlete who excels in all of them." Included in his narrative was the description of an act of kindness, repeated on one later occasion, toward a physically handicapped teammate, which resulted in a friendship. He did not, however, gloss over his shortcomings, candidly admitting joining with some friends to throw eggs at the house and car of C.R.'s sister because they "didn't like her". He regretted that—in part because he thought it contributed to C.R.'s parents' dislike of him—when his own car was egged at a later time, and "it made [him] feel worse about it."

¶ 45        Kochevar's relationship with C.R., as he described it, began as a friendship. He was 16, almost 17, and she was 14 when its character began to change. Their first sexual encounter occurred when he had turned 18 and she was 15. He described his feelings for her ("there is a big spot in my heart for that girl and I think there always will be") and expressed a hope that perhaps when she was 18 and could make her own decisions they would be able to get together. He said his relationship with C.R. was "wrong," and he understood why her parents were upset. However, he denied any knowledge that his actions were criminal, and there is no indication in the record that he possessed any criminal intent.

¶ 46        In response to a direct written question: "Did you violate any law with your relationship with C.R. and, if so what law?" his response was "I don't think I did mainly because she was all for it and we didn't drink or do drugs or anything like that. But the age thing plays a part." We

18

note that the additional questions appended to his narrative statement would cause any person of average intelligence to suspect that age might have been a factor in whatever had brought him to the police station.

¶ 47    The record in this case does not reveal a "sex offender who targets children" or a "sexual predator." We do note, however, that he has acknowledged and rationalized continuing to see C.R. after he was charged and in violation of no contact orders. What the record does show is a typical teenager—brash, occasionally rash, with soft spots and spurts of poor, but largely harmless, judgment—generally living life much like other teens. He was graduating, going off to college, full of potential and plans when he was removed from this relative homogeneity, charged, convicted, and sentenced for criminal sexual abuse. As a mandatory part of his sentence, he was and is required to register as a sex offender.

¶ 48                                B. Effect of Statute

¶ 49    Because he was 18 years old at the time of his offense, certain benefits, which would have been applicable to him had he acted six to seven months earlier, are unavailable. He is arguably (and the State in fact makes this argument) not entitled to the sentencing considerations afforded younger offenders by the United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012). Nor can he benefit from a juvenile's entitlement to more limited dissemination of his status as a convicted sex offender. 730 ILCS 152/121 (West 2016). Instead a few keystrokes on any internet browser will bring up Kochevar's name, his picture, the name and citation of his offense, and the fact of his conviction on the Illinois sex offender website. *Id.* § 120(c), (d). Upon inputting his name on the *national* website, a searcher will be referred to the State's more informative site. His status as a sex offender is thus broadcast to the world, and he faces a lifetime of employment rejection, public disdain, impairment of his enjoyment of parental

19

involvement and his discharge of parental responsibilities, curtailment of his liberty to live where he chooses and to move freely about his community, suspicion, and permanent stigma.

¶ 50 Kochevar notes that the public data on the website and additional information of a much more personal nature is required to be maintained by the Illinois State Police in the Statewide Sex Offender Database (*id.* § 115), and the local sheriff is required to disclose that information to numerous community groups whose duties and services relate to children. These include school boards, libraries, child care facilities, public housing agencies, the Department of Children and Family Services, and volunteer organizations. *Id.* § 120(a). The information may also be given to members of the public who request it. *Id.* § 120(c).

¶ 51 When he attends college, he is required to register with both local law enforcement and the school's public safety or security director; those people must be notified each and every time he competes in an out-of-town track meet or basketball tournament over a long weekend, goes on an extended trip with friends, or is otherwise absent from his residential community for three or more days. 730 ILCS 150/3 (West 2016); see also *People v. Pearse*, 2017 IL 121072.[5] Any slip-up with these notification obligations automatically extends his registration requirement by another 10 years. 730 ILCS 150/7 (West 2016).

¶ 52 Any contact with children (or even his mere presence in their general vicinity) is rigidly circumscribed. Beyond the negative impacts if he ultimately has children of his own or has

---

[5]In this decision, the supreme court ultimately reversed, after five years of prosecution and conviction, a decision of a divided appellate panel affirming the criminal conviction of a sex offender for failure to meet an allegedly new notification obligation because of his hospitalization. At the beginning of its analysis, the court observed, "in fairness to all concerned and as generally acknowledged by the parties, the circuit court, and the appellate court, the relevant statutory scheme leaves something to be desired, in terms of clarity and consistency, when applied to these facts." *Pearse*, 2017 IL 121072, ¶ 39. Such lack of precision in the regulations unfairly increases the burdens on those subject to their requirements and renders them even more onerous.

20

friends or family members with children, this particular restriction would effectively foreclose his "big plan" to provide and run a recording studio for "kids, singers or bands."

¶ 53　　This does not purport to be an exhaustive or comprehensive list of either the registration or notification obligations applicable to Kochevar but is merely a sampling of the restrictions imposed on him because of his conviction. And, as noted above, although his registration term is 10 years, any failure of strict compliance with the numerous technical registration and notification requirements results in an automatic extension for another 10 years. *Id.* Misunderstanding even one of the myriad rules, inadvertence, even hospitalization when a deadline arrives, or a new notification requirement is allegedly incurred (see *Pearse*, 2017 IL 121072) can extend a 10-year registration, one term at a time, to a lifetime obligation.

¶ 54　　　　　　　C. Application of the *Tetter* Analysis to Kochevar's Facts

¶ 55　　Of course, the major obstacle to Kochevar's requested relief is the unwavering position of our supreme court that the statutes in question do not constitute punishment. The State has cited and discussed the supreme court's decisions and the conforming decisions of all of the appellate districts in great detail, but its recitation was unnecessary—we are well aware of the line of cases beginning with *People v. Adams*, 144 Ill. 2d 381, 387-89 (1991), in which the court held that the restrictions of SORA are not punishment but rather are merely collateral consequences of conviction for covered sexual offenses, through *People v. Malchow*, 193 Ill. 2d 413 (2000), in which the court reaffirmed the sex offender laws are not punishment, and including its recent decision in *People v. Pepitone*, 2018 IL 122034, ¶ 18, in which it found the statute that

21

"completely bars sex offenders who have targeted children[6] from public parks" is facially constitutional. See also 720 ILCS 5/11-9.4-1(b) (West 2016).

¶ 56    The supreme court could not have made its position clearer. The SORA statutes do not constitute punishment or penalty. And yet offenders who live under SORA restrictions continue to be confronted with what certainly feels and operates as to them like punishment. We acknowledge, as a different panel of this court recently did in *Tetter*, 2018 IL App (3d) 150243, the heavy weight of supreme court precedent and still urge reconsideration and a different result in light of more recent statutory changes. We are mindful of the deference due the legislature's enactment of laws, and we recognize that the sex offender statutory scheme has been developed to address legitimate and important state concerns. It is also true, however, that the checks and balances built into our state and federal constitutions require the courts to evaluate or reevaluate challenged legislation to ascertain when or if it runs afoul of federal and state constitutional rights and protections. See *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165 (1963) (" '[i]f society is disturbed by civil commotion *** these safeguards need, and should receive, the watchful care of those intrusted with the guardianship of the Constitution and laws' " (quoting *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 124 (1866))). That duty is triggered in a situation such as this in which a claim has been raised that statutes deemed civil and regulatory appear to have evolved and become penal. More specifically in this case, Kochevar claims that changes to the original legislative system have converted a once-benign registration requirement with strictly limited dissemination to one of sweeping reach and harsh punitive consequences. To assist in evaluating such claims, the *Mendoza-Martinez* Court set out a multiple-factor test for determining whether civil regulation is or has evolved into punishment. This court in *Tetter*

---

[6]We note, as did *Pepitone*, that this particular statute expressly exempts persons, such as Kochevar, who committed "Romeo and Juliet" criminal abuse from its coverage.

applied those factors to the sex offender statutory scheme and concluded that the scheme has become penal. Having and intending to convey no disrespect to the supreme court or to the legislature, we endorse, adopt, and incorporate the arguments set out in *Tetter* that make such a case, and we apply its findings in this case.

¶ 57    The *Tetter* majority undertook a careful, thorough, and thoughtful retrospective of sex offender registration and notification cases in the Illinois and federal courts and constructed a compelling argument that changes in the implementation and reach of the registration itself and the increasingly burdensome and debilitating restrictions of the legislative program have gradually, but inexorably, transformed rationally based, protective consequences into a statutory scheme that is indeed punitive. Using the five-factor test set out in *Mendoza-Martinez*, 372 U.S. at 168-69, *Tetter* meticulously tracks the evolution of sex offender registry cases and the legislatively enacted registration, notification, and restriction regulations to assess whether legislation intended to create a *civil* regulatory scheme is "so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." (Internal quotation marks omitted.) *Tetter*, 2018 IL App (3d) 150243, ¶ 41 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997), quoting *United States v. Ward*, 448 U.S. 242, 248-49 (1980)).

¶ 58    With regard to the first *Mendoza-Martinez* factor, our supreme court found in *Malchow*, 193 Ill. 2d at 421, that the 1998 version of the Notification Law placed no affirmative disability or restraint on sex offenders. Similarly, the United States Supreme Court in *Smith v. Doe*, 538 U.S. 84, 101 (2003), validated Alaska's sex offender registry law because it left sex offenders "free to move where they wish and to live and work as other citizens, with no supervision." *Tetter* noted that in the years since those decisions were issued, the Illinois legislature has significantly increased the number, severity, and technicality of requirements and restrictions on

23

sex offenders. *Tetter*, 2018 IL App (3d) 150243, ¶ 45. *Tetter* compared these restrictions with conditions of parole (*id.* ¶¶ 46-50)—acknowledged by our courts as punitive—and concluded: "Although not to the same degree as prison, the sex offender statutes' restrictions affirmatively disable and restrain offenders such as defendant." *Id.* ¶ 52. *Tetter* thus found the first *Mendoza-Martinez* factor satisfied. *Id.*

¶ 59        Turning to whether the sanction has been historically regarded as punishment—the second *Mendoza-Martinez* factor—*Tetter* compared SORA with Michigan's sex offender registration scheme, as analyzed by the Sixth Circuit Court of Appeals in *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016). The *Snyder* court described Michigan's statute as meeting "the general definition of punishment, [having] much in common with banishment and public shaming, and [having] a number of similarities to parole/probation." *Id.* at 703. Finding the restrictive contours to be similar, but deeming our sex offender statutes even more restrictive than Michigan's and equally akin to historically recognized forms of punishment, *Tetter* found the second *Mendoza-Martinez* factor had been met. *Tetter*, 2018 IL App (3d) 150243, ¶¶ 54-56.

¶ 60        *Tetter* next considered the third *Mendoza-Martinez* factor—whether operation of the sanction promotes the traditional aims of punishment—and identified those traditional aims as deterrence, incapacitation of offenders, and retribution. *Id.* ¶ 59. The court noted that the expressed purpose of Illinois's SORA and Notification Law scheme is to protect children from sex offenders by deterring recidivism, admittedly a goal that can also be achieved by a civil regulatory scheme that restricts access to children and denies offenders opportunities to reoffend. *Tetter* observed, however, that the SORA and Notification Law statutes also incapacitate offenders by banning them outright or severely curtailing their access to places where children normally congregate and where the offender may have legitimate reason to go or to be. It was the

24

*absence* of this type of restriction that persuaded the *Smith* majority to conclude that Alaska's law was not punitive at that time. *Id.* ¶ 44 (citing *Smith*, 538 U.S. at 101). The sanctions also serve as retribution for sex crimes by restricting the freedom of all offenders—almost uniformly without consideration of the nature and severity of their offense or of the likelihood of their reoffending—to live where they choose and move freely about the community in which they live and by regulating even such intrinsically personal decisions as taking a three-day trip to visit your grandmother (see 730 ILCS 150/3(a) (West 2016)) or waiting four or five minutes ("loitering") near a school for a friend whom you had driven there to drop off lunches for her grandchildren (see *People v. Howard*, 2017 IL 120443). Under these statutes, offenders are certainly *not* "free to *** live and work as other citizens, with no supervision." *Smith*, 538 U.S. at 101. *Tetter* concluded the registration and notification requirements and the restrictions on the ability of offenders to live normal and productive lives that are imposed by the SORA statutory scheme meet all three of the traditional goals of punishment and thus satisfy the third *Mendoza-Martinez* factor. *Tetter*, 2018 IL App (3d) 150243, ¶ 59.

¶ 61     The fourth and fifth *Mendoza-Martinez* factors—rational relationship to an alternative, nonpunitive purpose and whether the sanction appears excessive in relation to that nonpunitive purpose—were considered together in *Tetter*. *Id.* ¶¶ 61-69. As framed by the *Smith* majority, "[t]he question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105. *Tetter* used the following quote from Justice Souter, concurring in *Smith*, as the point of departure for this consideration: " '[W]hen a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones.' " *Tetter*, 2018 IL App (3d) 150243, ¶ 63 (quoting *Smith*, 538 U.S. at 109 (Souter, J., concurring)).

25

*Tetter* notes in that regard that "[o]ur sex offender statutes, unlike Alaska's SORA in *Smith*, restrict all sex offenders' (not just dangerous ones') liberty of movement in society," and further observes that Illinois's individual evaluation of sex offenders' likelihood to reoffend is not even considered in the application of the statutes. *Id.* ¶¶ 65-66. This lack of differentiation renders the entire system suspect and enables *Tetter*'s conclusion that: "In light of its nonpunitive purpose, protecting the public from dangerous sex offenders, the sex offender statutes' scope and substance is unreasonably punitive." *Id.* ¶ 64.

¶ 62　　　　*Tetter* also fairly observed that a different analysis might apply "[i]f the sex offender statutes' application were not *irrevocable*." (Emphasis in original.) *Id.* ¶ 68. The *Tetter* court noted the finding in *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 203 (2009), that "a *juvenile* offender's ability to petition for termination [of the registration obligation] after five years was indicative of a nonpunitive restriction." (Emphasis added.) *Tetter*, 2018 IL App (3d) 150243, ¶ 68. Even after the expiration of a nonextended, 10-year term, the statutes impose restrictions on employment, community service, business enterprises, recreation, and presence elements of everyday life that remain in effect for the rest of the sex offender's life—all without regard to the seriousness of his offense, his rehabilitative potential, or the likelihood of his ever reoffending. See generally 720 ILCS 5/11-9.3(c), (c-5)-(c-8) (West 2016). One example of the pervasiveness of the statutory restrictions is the fact that, unlike most other Illinois drivers, the driver's license of a sex offender must be renewed annually. 730 ILCS 5/5-5-3(o) (West 2016).

¶ 63　　　　In sum, we are persuaded that *Tetter*'s legal analysis is sound, and we agree with its conclusion that the sex offender statutory scheme has morphed from civil regulation into something that is indeed punitive. Our conviction of the rightness of this conclusion is strengthened when we apply the statutory restrictions to Kochevar and assess their necessity in

light of his offense and his individual characteristics. *Tetter* contended that sex offender statutes *do constitute* punishment because they fall within the " 'continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service' " (*Tetter*, 2018 IL App (3d) 150243, ¶ 69 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987))), and noted that several of our sister states have found similar statutes to be punitive (see *Doe v. Department of Public Safety & Correctional Services*, 62 A.3d 123 (Md. 2013); *Gonzalez v. State*, 980 N.E.2d 312, 321 (Ind. 2013); *Starkey v. Oklahoma Department of Corrections*, 2013 OK 43, 305 P.3d 1004; *State v. Letalien*, 2009 ME 130, 985 A.2d 4; *State v. Williams*, 129 Ohio St. 3d 344, 2011-Ohio-3374, 952 N.E.2d 1108; *Commonwealth v. Baker*, 295 S.W.3d 437 (Ky. 2009)). *Tetter*, 2018 IL App (3d) 150243, ¶ 69.

¶ 64        Pursuant to our conclusion that Kochevar's subjection to the sex offender restrictions is punishment, we next assess his claims that this punishment is both excessive and disproportionate. The prism through which we do this is generally the same under the eighth amendment to the United States Constitution and the proportionate penalties clause of our state constitution. *People v. McDonald*, 168 Ill. 2d 420, 455 (1995). The eighth amendment, in addition to prohibiting punishment that is cruel and unusual, also forbids " 'extreme sentences that are grossly disproportionate to the crime.' " *Tetter*, 2018 IL App (3d) 150243, ¶ 72 (quoting *Graham v. Florida*, 560 U.S. 48, 60 (2010)). Whether that standard has been met is examined considering the totality of the circumstances and applying the following three-factor test: (1) does the gravity of the offense comport with the harshness of the penalty, (2) are more serious crimes subject to the same or a less serious penalty, and (3) do other jurisdictions have the same punishments for the same crime. *Id.* ¶ 73 (citing *Solem v. Helm*, 463 U.S. 277, 290-92 (1983)).

27

¶ 65      The proportionate penalties clause in our state constitution requires that penalties shall be proportionate to the nature of the offense. Ill. Const. 1970, art. I, § 11. A sentence may be found unconstitutionally disproportionate if (1) the penalty is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community or (2) offenses with identical elements are given different sentences. *People v. Sharpe*, 216 Ill. 2d 481, 521 (2005). The reality of the sex offender registration and notification strictures is that, under most of the regulations, the same penalties are imposed upon conviction of a sex offense involving a minor without consideration of whether it is a single act of teen sex or persistent predatory sexual conduct; the second alternative does not apply. Accordingly, we analyze Kochevar's claim to determine whether, *as to him*, the penalties in the statute are so wholly disproportionate as to shock the moral conscience of the community.

¶ 66      In beginning this analysis, we stress that we do not denigrate the gravity of Kochevar's crime. We do, however, believe that its *degree* of seriousness, relative to other sex offenses, is suggested by two facts: first, its classification by the legislature as a class A misdemeanor—the least serious of covered offenses and, second, that except for the sex offender requirements, the sentence imposed by the court was 90 days in the Whiteside County jail, with 80 of those days suspended, and a 24-month term of probation. By contrast with that sentence and under any reasonable standard of comparison, the pervasive negative impact of the SORA regulations is genuinely shocking in this case.

¶ 67      Of paramount importance, there is nothing in the record that suggests that this young man targeted children, targeted underage girls, or even targeted C.R. According to the record, based on Kochevar's statements, he and C.R. were engaged in a friendship that evolved over time into a relationship that was sexual. He was not a predator. With regard to his individual risk

28

assessment, forensic psychologist Kirk Witherspoon conducted a psychological evaluation prior to sentencing and concluded in his final report that there was no evidence of sexual deviance and the likelihood of reoffending was termed "low-to-moderate." Kochevar reported to Witherspoon that, other than C.R., all of his sexual partners have been his age or older. We find nothing in his personal record or in the record on appeal that suggests that the rigid technical strictures of the sex offender statutes are necessary to restrain instincts or predilections to prey on children that Kochevar gives no evidence of having now or ever having had. The imposition of the restrictions is punitive, and because it is unnecessary in order to secure Kochevar's compliance with the statutes' expressed purpose of preventing abuse of children, it is grossly disproportionate to his crime and violates the eighth amendment to the United States Constitution.

¶ 68     Further, that the severe punitive impact on Kochevar constitutes a penalty subject to evaluation under the proportionate penalties clause seems clear to us. This was a young man who the record shows had worked hard to excel academically, athletically and, most importantly, as a decent human being and was planning for a promising future. He was charged with and convicted of a sexual crime and removed from the typical teen pool. Now, after having served his sentence, he is tethered to that youthful mistake by a plethora of restrictions, some of which are effective for 10 years and others for the rest of his life. This system that the legislature has devised affirmatively obstructs the State's constitutional objective of restoring this particular offender to useful citizenship in violation of the proportionate penalties clause of the Illinois Constitution.

¶ 69     For all of the foregoing reasons, we find Illinois's statutory sex offender scheme, as applied to Kochevar, violates both the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution. We affirm Kochevar's conviction,

29

jail sentence, and term of probation. We vacate his requirement to register as a sex offender and to comply with SORA (730 ILCS 150/1 *et seq.* (West 2016)), the Notification Law (730 ILCS 152/101 *et seq.* (West 2016)), section 11-9.3 of the Criminal Code of 2012 (720 ILCS 5/11-9.3 (West 2016)), section 5-5-3(o) of the Unified Code of Corrections (730 ILCS 5/5-5-3(o) (West 2016)), and section 21-101 of the Code of Civil Procedure (735 ILCS 5/21-101 (West 2016)). The matter is remanded to the Whiteside County circuit court for the entry of an order consistent with this opinion.

¶ 70        Affirmed in part and vacated in part; cause remanded with directions.