# Illinois Official Reports

## Appellate Court

---

### *People v. Cetwinski*, 2018 IL App (3d) 160174

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD R. CETWINSKI, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-16-0174 |
| Filed | October 26, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 10-CF-1918; the Hon. Amy M. Bertani-Tomczak, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Andrew J. Boyd, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justice Lytton concurred in the judgment and opinion.<br>Justice Wright specially concurred, with opinion. |

**OPINION**

¶ 1    Defendant, Edward R. Cetwinski, appeals following his conviction for criminal sexual assault and aggravated criminal sexual abuse. He argues that certain comments from the circuit court made during jury instructions served to hasten the jury's verdict. He also argues that the Illinois statutory scheme of lifetime penalties to which convicted sex offenders are subjected is unconstitutional as applied to him. We affirm.

¶ 2                                    FACTS

¶ 3    The State charged defendant with one count of criminal sexual assault (720 ILCS 5/12-13(a)(4) (West 2010)) and two counts of aggravated criminal sexual abuse (*id.* § 12-16(d)).

¶ 4    Prior to trial, the defense arranged for defendant to be examined by a licensed clinical professional counselor. The resulting report listed a number of "Identified Risk Factors," and many more "Factors Mitigating Risk." The cover letter to the report also noted that the results of two diagnostic tests indicated defendant was a low risk to reoffend, though the actual test results were not included in the report. The report variously described defendant as dominant, narcissistic, obsessive, and immature, concluding that "[defendant's] testing indicates very severe character pathology. He has deeply ingrained dysfunctional personality patterns."

¶ 5    The report also contained a number of caveats; for example, it noted:

"Such a severe 'fake good' response set exists that test findings are of questionable validity as [defendant] minimized pathology and presented himself in an unrealistically positive manner. While this minimization is probably conscious, such responses may also be a direct result of [defendant's] pathology. Test findings are presented to indicate how [defendant] wishes others to view him and may not be an accurate reflection of his true clinical picture."

The report also indicated that "[f]urther clinical verification is needed to assist in the interpretation of test findings in light of [defendant's] unique history and present circumstances." Additionally, the report noted that the nature of the testing might tend to deemphasize defendant's strengths and that use of the results for purposes other than clinical screening could be "misleading." The court denied the defense's request to introduce the report into evidence, pointing out that the risk of recidivism would be irrelevant at trial.

¶ 6    On December 2, 2015, the case proceeded to a jury trial. At trial, S.G. testified that she was born in 1994 and was a sophomore at Lincoln-Way Central High School (Lincoln-Way Central) from the fall of 2009 through the spring of 2010. That school year, she participated on the school bowling team. Defendant was one of the team's assistant coaches. She referred to him as "Coach Ed."

¶ 7    S.G. testified that she and defendant initially exchanged phone numbers so that he could help her get her bowling ball redrilled. They began sending text messages to one another after Christmas in 2009, approximately midway through the bowling season. At first, their text messages were only about bowling and coaching. Eventually, S.G. testified, they began "[s]ending dirty texts to each other." S.G. testified that the text messages eventually escalated into a physical relationship. She testified that she and defendant had sexual contact on two

occasions. S.G. recalled being interviewed at the child advocacy center. She admitted that she told the interviewer that they had only had sexual contact once. At trial, S.G. explained: "I was scared and nervous and I didn't want to talk to anybody about it and I smashed it together."

¶ 8      S.G. testified that the first incident of sexual contact occurred when defendant gave her a ride home after a bowling tournament. S.G. recalled that on the way home, defendant parked at a bus barn in Manhattan and kissed her. S.G. testified that defendant then put his fingers inside her vagina. Defendant then drove her home.

¶ 9      The second incident of sexual contact also occurred when defendant was driving S.G. home. Defendant again parked by the bus barn and kissed S.G. This time, S.G. testified, defendant asked her to move to the backseat. S.G. did so, moving to the middle of the back bench of defendant's van. She testified that defendant knelt in front of her, put his fingers in her vagina, then put his mouth on her vagina. Defendant indicated to S.G. that he was about to ejaculate, which S.G. took as the reason they did not engage in full intercourse on that occasion.

¶ 10      Steve Provis, the principal at Lincoln-Way Central, testified that defendant's daughter, N.C., and another student approached him on September 10, 2010. Based on that conversation, Provis and another school official spoke to S.G., who indicated that she had been involved in sexual activity with defendant. Provis brought in the school resource officer, who in turn contacted the Manhattan Police Department.

¶ 11      Thomas Friddle testified that he was a detective with the Manhattan Police Department on September 10, 2010, the day he was notified of S.G.'s allegations. As part of his investigation, Friddle interviewed defendant, along with Officer Christopher Spencer. A video recording of that interview was played for the jury.

¶ 12      In the interview, defendant confirmed that he was born in 1969 and that he has been an assistant coach for the Lincoln-Way Central girls bowling team the previous season. Defendant told Friddle that in December 2009 he gave S.G. a ride home after a bowling tournament. Defendant initially stated that nothing unusual occurred on the ride home. He denied ever making a sexual advance or attempting to kiss S.G. Defendant admitted that he and S.G. exchanged occasional text messages but denied that they were sexual in nature.

¶ 13      Friddle informed defendant that investigators would be able to retrieve old text messages, even if they had been deleted. Defendant then admitted that S.G. had sent him text messages that had been sexually explicit. He engaged in sexual role-playing via text message with her. Some of the role-playing involved being in his van. Defendant continued to deny that he ever had physical contact with S.G. of any kind.

¶ 14      Friddle and Spencer pressed defendant to be honest with them. Defendant asked what would happen to him if he was. Spencer replied:

     "[M]y report and Officer [Friddle's] report are going to reflect everything that happened here today, okay; and when it gets time—if it gets that far—for somebody to get the consequences for their actions, all that stuff is taken in to consideration. Do you follow me?"

Friddle assured defendant that "[s]exting" with a minor and having physical sexual contact with a minor were "[b]asically the same thing." Defendant then admitted that on the night he drove S.G. home, he parked the van and they began kissing. He touched her under her shirt,

then they moved to the back of his van. Defendant told the investigators that he performed oral sex on S.G. but did not engage in sexual intercourse because he "prematurely finished." Defendant later provided a written statement acknowledging that he had performed oral sex on S.G.

¶ 15 Defendant's father, Joseph Cetwinski, testified for the defense. He testified that he and defendant were assistant coaches for the girls bowling team in the 2009-10 season. Joseph, defendant, and N.C., would always drive together to the school before bowling events, except for one time. Joseph recalled on that one occasion, defendant informed him that S.G. needed a ride. Joseph drove to the school with N.C. that day. Defendant took S.G. home after the meet ended. Joseph testified that nothing unusual happened that evening when defendant returned from taking S.G. home.

¶ 16 Michele Stultz, defendant's girlfriend, testified that in September 2010, N.C. informed her that rumors regarding defendant were spreading at school. Stultz informed defendant, who instructed Stultz to tell N.C. to talk to the school principal. Stultz relayed the instruction to N.C.

¶ 17 N.C., defendant's daughter, testified that in September 2010, her friends informed her that S.G. was bragging about sleeping with defendant. N.C. told Stultz because defendant was in Missouri at the time. On Stultz's advice, N.C. told Provis of the rumors. N.C. also testified that a few days after she went to the principal, she overheard S.G. in the hallway saying that "she made it all up, she was just trying to be part of the popular kids who all had older boyfriends and did stuff with them." On cross-examination, N.C. agreed that twice during the bowling season she and Joseph drove to and from school for bowling meets without defendant. N.C. did not contact school authorities or the police when she overheard S.G. state that she "made it all up."

¶ 18 Defendant testified that S.G. sent him flirtatious or sexual related text messages and that he responded. Defendant admitted that on one occasion during the bowling season, S.G. asked him for a ride to school for the meet. Defendant picked S.G. up at her house and drove her to the school. After the meet, he drove her home. He never stopped at a bus barn and did not try to kiss S.G. They did not go into the back of his van, and he did not perform oral sex on her. He never did anything physically sexual with S.G.

¶ 19 At some point in 2010, defendant was in Missouri when he received a phone call from Stultz regarding the present allegations. Defendant told Stultz to instruct N.C. to talk to the school principal. When defendant returned from Missouri, he had a "brief conversation" with N.C. in which she told him that she had gone to the principal's office.

¶ 20 Defendant recalled going to the Manhattan Police Department to be interviewed by Friddle and Spencer. Defendant testified that as he walked to the interview room, he overhead Friddle and Spencer engaging in "a conversation about an incident that had happened with somebody having a premature ejaculation during a sexual event." Defendant thought that description "sounded pretty similar" to what he had heard from N.C. Regarding the interview, defendant explained that he admitted to doing something that he did not actually do. Defendant continued:

"I've never been in a situation such as that before and I was very nervous. And I was under the assurance that if I told them details of an incident that happened I would be able to go home that evening and that they would work with me. So I just told them what I had already heard prior to coming in."

¶ 21    On cross-examination, defendant testified that he was a high school graduate and was currently enrolled in college. He was 41 years old at the time of his interview at the police station and considered himself to be of above-average intelligence. Defendant signed his written statement approximately 2½ hours after arriving at the police station, though, he testified, it felt like much longer. There were two breaks in the interview.

¶ 22    Sheri Krohn testified in rebuttal that she was the bus driver for all of the bowling team's meets and tournaments during the 2009-10 season. At one meet, she noticed S.G. wearing defendant's jacket and "following him around a lot." She told defendant to "be careful because [S.G.] had a crush on him."

¶ 23    The State also recalled Friddle on rebuttal. Friddle denied having any conversation with defendant or Spencer regarding the investigation while the three men were together just prior to the interview.

¶ 24    Following closing arguments, the court tendered instructions to the jury. The court explained that the jury would eat lunch in the jury room and select a foreperson prior to commencing deliberations. After conferring with the attorneys, the court continued:

> "Okay. All right. I wanted to talk with the attorneys. I know that some of you want to go outside for a few minutes. So the agreement is that before you do anything you are going to go outside, have your cigarette, and that's okay, because once you get in there you can't leave. And once you start deliberating, you can't leave. So that is what will happen. Those who want to go out and have a cigarette, go ahead. And then when you come back to the room, you are not allowed to leave after that. Let's see, it's ten to three now. Make sure you are back in by 3:00 ***. So make sure everybody is back in there at three to start your deliberations. If you are out there smoking, you cannot talk about the case. *** Just simply enjoy your tobacco and come back, okay?"

¶ 25    The jury found defendant guilty on all counts. The signed verdict forms were file-stamped December 7, 2015, 4:55 p.m.[1]

¶ 26    Defendant subsequently filed a motion for new trial. In the motion, defendant argued, *inter alia*, that "the jury failed to give proper weight and/or deference to the task of deliberating." In support of this argument, defendant alleged that the jury had been released for deliberations at 3 p.m., "following a brief, Court-permitted smoke break," and that defense counsel received a phone call from the court clerk at 4:10 p.m. notifying him that the jury had reached a verdict. The court denied defendant's motion.

¶ 27    On January 26, 2016, the court sentenced defendant to a term of six years' imprisonment for criminal sexual assault and four years' probation for aggravated criminal sexual abuse. The court noted that defendant would also be subject to mandatory reporting as a sex offender upon his release.

¶ 28                                                    ANALYSIS

¶ 29    On appeal, defendant argues that the circuit court's comments regarding the jurors' ability to leave the room while deliberating served to hasten the jury's verdict, thus denying defendant a fair trial. He also argues that the statutory scheme of lifetime penalties for a

---

[1]Jury deliberations began on December 7.

convicted sex offender in Illinois is unconstitutional as applied to him.

¶ 30                                    I. Jury Deliberations

¶ 31    Defendant first contends that the circuit court's repeated admonitions that the jury would not be able to leave the jury room once it began deliberating served to hasten the verdict. Defendant urges that this conclusion is bolstered by the relatively brief period in which the jury actually deliberated.[2]

¶ 32    It is improper for the circuit court to deliver any message or instruction to the jury that might have the effect of hastening the verdict. *People v. Golub*, 333 Ill. 554, 561 (1929). "The test is whether, under the circumstances, the language used by the court actually coerced or interfered with the deliberations of jurors to the prejudice of a defendant." *People v. Foster*, 394 Ill. App. 3d 163, 166-67 (2009).

¶ 33    Initially, defendant concedes that he failed to properly preserve this issue for appeal. However, he invites this court to relax the forfeiture rules under the *Sprinkle* doctrine. In *Sprinkle*, our supreme court held that forfeiture rules may be relaxed as to issues of the circuit court's conduct, where a contemporaneous objection would be unavailing or even harmful to a defendant's case. *People v. Sprinkle*, 27 Ill. 2d 398, 400-01 (1963). The supreme court has since explained that "*Sprinkle* was primarily concerned with the risk of alienating the jury by appearing disrespectful of the court's authority." *People v. McLaurin*, 235 Ill. 2d 478, 487 (2009). The *Sprinkle* doctrine has also been applied in select contexts where, even in the absence of a jury, an objection would likely " 'have fallen on deaf ears.' " *Id.* at 488 (quoting *People v. Davis*, 378 Ill. App. 3d 1, 10 (2007)).

¶ 34    The logic underlying *Sprinkle* must be weighed against the strong policy in favor of preserving errors for review. The *McLaurin* court emphasized this point, noting that "[f]ailure to raise claims of error before the trial court denies the court the opportunity to correct the error immediately and grant a new trial if one is warranted, wasting time and judicial resources." *Id.* Based on this policy, the *McLaurin* court recognized that the relaxation of forfeiture had rarely been invoked in noncapital cases, and that such relaxation is appropriate "only under extraordinary circumstances." *Id.*

¶ 35    We decline to apply the *Sprinkle* doctrine in the present case. Had defense counsel felt that the court's comments were in error, he could easily have requested a brief sidebar once those comments had concluded. This would have provided the court an opportunity to reconsider its remarks and, if the court found it necessary, issue additional instructions emphasizing that the jurors should be under no rush. It is difficult to envision how pursuing this course of action would have undermined defense counsel's credibility in the eyes of the jury, and defendant has provided no explanation for why such an objection would have fallen on deaf ears. See *id.* Not only did counsel's failure to object deprive the court of an opportunity to potentially issue corrective instructions, his failure to raise the issue in the motion for new trial deprived the court of an opportunity to grant a new trial. While that

---

[2]Defendant asserts that the jury deliberated for 1 hour and 10 minutes before reaching a verdict. The only source for this calculation is defense counsel's own assertion found in the motion for new trial. The file-stamped jury forms indicate that deliberations took, at the very most, 1 hour and 55 minutes. In any event, the jury's deliberations may safely be characterized as relatively brief, and the outcome of this appeal does not turn on the precise number of minutes elapsed.

motion did reference the jury's short deliberation period, it did not claim any error based on the circuit court's remarks, as defendant argues on appeal.

¶ 36    Because we decline to relax forfeiture principles in this case, we review defendant's claim for plain error. The first step in any plain error analysis is to determine whether any error was committed. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). We acknowledge that the parties dispute whether this court should apply a *de novo* or an abuse of discretion standard of review. We need not settle that dispute because, under either standard, it is clear that the circuit court committed no error in its comments.

¶ 37    Defendant insists that the court's comments implied that the members of the jury would be forced to remain in the jury room, without exception, until they reached a verdict. In essence, the defendant argues, the jury would be trapped in the room. This interpretation is simply not tenable when taking the court's remarks in context. We find it is unlikely that any juror would take those comments to mean that they would be confined in the jury room against their will.

¶ 38    An examination of the court's *full* remarks makes clear that the court was specifically addressing any jurors that wished to have a cigarette before deliberations began, as it referenced smoking or tobacco four times within those brief remarks. The court was merely informing the jurors that they would be afforded no smoking breaks after deliberations had begun. Defendant insists that the court "did not restrict its direction to the smokers." Yet the court clearly prefaced its smoking-related instructions by stating "I know that *some of you* want to go outside for a few minutes." Short of physically separating the smokers from the nonsmokers, it is unclear what steps defendant would have had the court take to address the smokers.

¶ 39    Indeed, the court's innocuous smoking restriction in the present case is a far cry from the example of the egregious treatment of a jury in the late seventeenth century, a formative period in the common law with respect to jury control. In the famous trial of William Penn and William Mead, the court repeatedly refused to accept a verdict with which it did not agree. The court instructed the jury:

> "Gentlemen, you shall not be dismissed till we have a verdict that the court will accept; and you shall be locked up, without meat, drink, fire, and tobacco; you shall not think thus to abuse the court; we will have a verdict, by the help of God, or you shall starve for it." *Trial of Penn and Mead* (1670) 6 How. 951, 963.

The jurors in that case were only able to escape their detention after requesting the Court of Common Pleas to issue a writ of *habeas corpus*. *Bushell's Case* (1729) 84 Eng. Rep. 1123; 6 How. 999 (Common Pleas) (a seminal case discussing the role of jurors and establishing the principle of jury nullification).[3] While the *Penn* court's actions were objectionable even in

---

[3]As a matter of historical background, some of the jurors in Penn and Mead's case, after having won their discharge from custody via *habeas corpus*, attempted to sue the judge (the Recorder of London) and other officials responsible for their incarceration for false imprisonment. Each time, their attempts were rejected by the English courts. *Hamond Against Howell* (1796) 86 Eng. Rep. 816; 1 Mod. 184 (Common Pleas); *Bushell's Case* (1796) 86 Eng. Rep. 777; 1 Mod. 119 (King's Bench); *Hamond Against Howell* (1793) 86 Eng. Rep. 1035; 2 Mod. 218 (Common Pleas 1678). This line of cases provided an early statement of the now well-settled tenet of judicial immunity that states, generally, a private action may not be commenced against a judge "for what they should do in execution of their

1670, an echo of the trial judge's sentiments could still be found in Illinois law in the nineteenth century. An 1845 law required that an officer be sworn to attend to the jury and "keep them together without meat or drink, water excepted, unless by leave of the court, until they shall have agreed upon their verdict." Ill. Rev. Stat. 1845, ch. 30, § 189;[4] see also *East St. Louis Connecting Ry. Co. v. Eggmann*, 71 Ill. App. 32, 35 (1897) ("If the court had kept the jury out until it convened the next morning, 'without meat or drink, fire or light,' as in William Penn's case, what good would it have done?"). Against this historical backdrop, it is difficult to discern how the jury's limitation to but a single smoking break in the present case could have been of any legal import.

¶ 40    In responding to the State's assertion that the court was merely addressing the smokers, defendant briefly contends: "[t]hat instruction would have put a great deal of pressure on the jurors who were addicted to nicotine to quickly arrive at a verdict." This lone sentence, unsupported by case law or facts of records, is the extent of defendant's argument on that particular point. Notably, the supreme court of Ohio has rejected that very argument, writing:

> "[The defendant's] claim that this juror suffered from nicotine withdrawal is totally speculative. The simple request, 'can we smoke?' does not indicate any type of emergency. There is no support in the record for [the defendant's] claim that the juror who wished to smoke was under any additional stress occasioned by 'mentally wanting, and physically needing to smoke tobacco.' " *State v. Elmore*, 111 Ohio St. 3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 94.

Defendant's argument here is similarly speculative.

¶ 41    Because we find no error, there can be no plain error. However, we write further to point out that even if the circuit court's comments could be construed as error, defendant has failed to demonstrate second-prong plain error. In *People v. Thompson*, 238 Ill. 2d 598, 614 (2010), our supreme court found that the circuit court's failure to properly admonish a jury of the *Zehr* principles (*People v. Zehr*, 103 Ill. 2d 472 (1984)) would amount to a second-prong or structural error only where that failure resulted in a biased jury. Noting that the defendant had the burden of persuasion in plain error analysis, the court rejected the defendant's plain error argument on the grounds that he had "not presented any evidence that the jury was biased in this case." *Thompson*, 238 Ill. 2d at 614.

---

office" even if in error. *Hamond Against Howell* (1796) 86 Eng. Rep. 816, 817; 1 Mod. 184, 185; see also *Hamond Against Howell* (1793) 86 Eng. Rep. 1035, 1036-37; 2 Mod. 218, 220-21 ("But the whole Court were of opinion, that the bringing of [the juror's] action was a greater offence than the fining of [the juror], *** and that it was a bold attempt both against the Government and justice in general."); see also, *e.g.*, *Floyd and Barker*, (1572) 77 Eng. Rep. 1305 (Star Chamber) (holding that a judge could not be prosecuted in another court for an alleged criminal conspiracy in his handling of a murder trial); *Case of the Marshalsea*, (1572) 77 Eng. Rep. 1027, 1028 (King's Bench) (no immunity when the court was without jurisdiction); *Pulliam v. Allen*, 466 U.S. 522, 549 (1984) ("It has long been recognized at common law that judicial immunity protects only those acts committed within the proper scope of a judge's jurisdiction, but provides no protection for acts committed in excess of jurisdiction."). The holding in *Pulliam* was abrogated in part by the Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 309(c), 110 Stat. 3847, 3853 (codified at 42 U.S.C. § 1983 (2000)).

[4]The present version of this statute requires only that "[w]hen the jury retires to consider its verdict an officer of the court shall be appointed to keep them together and to prevent conversation between the jurors and others." 725 ILCS 5/115-4(*l*) (West 2016).

¶ 42    While the error contemplated in *Thompson* is surely different from that in question here, we find the case to be analogous. A finding that the verdict in defendant's case was produced by a jury that believed it was strictly confined to a room until such time as it delivered a verdict would undoubtedly constitute second-prong plain error, as it would undermine defendant's right to a fair trial and challenge the integrity of the judicial process. But even if the circuit court's comments could be construed as giving that impression, defendant has presented no evidence that the verdict was actually hastened.

¶ 43    Initially, the demonstration of such an effect is an especially high hurdle in cases concerning a court's initial, predeliberation instructions to a jury. Reflecting this point, reversible error for hastening the verdict has been exclusively found in the case of comments made in the *middle* of a jury's deliberations. For example, in *People v. Friedman*, 144 Ill. App. 3d 895, 903-04 (1986), the jurors deliberated for four hours before the circuit court informed them that overnight accommodations for sequestration would soon be made. The jury returned a verdict five minutes later, and the reviewing court found that the verdict had been improperly hastened. Similarly, in *People v. Branch*, 123 Ill. App. 3d 245, 250 (1984), the jury deliberated for 4½ hours before informing the court that it was deadlocked. The court addressed the jury, referencing the possibility of sequestration, and a verdict was delivered 10 minutes later. Again, the reviewing court found reversible error. Even in the foundational cases for this particular point of law—*Farnham v. Farnham*, 73 Ill. 497, 502 (1874), and *Golub*, 333 Ill. at 561—at issue were comments made in the middle of deliberations; even then, both courts found no reversible error. Defendant has failed to cite a single case—and this court is unaware of any—in which hastening the verdict was found to be a reversible error based upon the circuit court's *initial* instructions to the jury.

¶ 44    In cases concerning intradeliberational instructions, the effect on the jury may be easily measured by comparing the time spent deliberating before the instruction to the time spent deliberating after, as did the courts in *Friedman* and *Branch*. In this case, defendant only cites to the relatively short period in which the jury deliberated as evidence of a hastened verdict. However, as the *Ramos* court pointed out, claiming the deliberation period as probative evidence of haste is problematic:

        "Defendant points to the duration of the deliberations to support a hastening influence by the trial judge. Yet, one could just as reasonably conclude that the verdict was hastened by the significant and compelling evidence of defendant's guilt. We do not perceive it is our place to determine what is the proper duration of time for deliberations. Moreover, defendant's argument presents a logical fallacy of the *post hoc ergo propter hoc* variety we are not prepared to credit. In effect, defendant contends, because the deliberations were—in his view—short or hasty, they were hastened by the remarks of the trial judge. We disagree with the premise and the conclusion." *People v. Ramos*, 396 Ill. App. 3d 869, 881 (2009).

¶ 45    We would reach the same conclusion here. Given the significant and compelling evidence against defendant—including a video recording of his own confession—it is perfectly plausible, if not expected, that the jury could reach a prompt verdict. The circuit court's remarks that the jury would not be afforded multiple smoking breaks were not improper, and the understandably prompt verdict is not evidence that the jury reached its verdict under any form of duress.

¶ 46                    II. Constitutionality of Sex Offender Statutory Scheme

¶ 47       Defendant next argues that the statutory scheme of lifetime penalties to which he is subject as a convicted sex offender and sexual predator is unconstitutional as applied to him on the grounds that it violates the United States Constitution's prohibition of cruel and unusual punishment (U.S. Const., amend. VIII) and the Illinois Constitution's proportionate penalties clause (Ill. Const. 1970, art. I, § 11).

¶ 48       Importantly, defendant challenges the constitutionality of several statutes pertaining to convicted sex offenders, rather than a single statute. The primary piece of that statutory scheme is the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2016)), which, *inter alia*, acts to classify defendant as a sexual predator and imposes a lifelong duty to register. The statutory scheme also includes the Sex Offender Community Notification Law (Notification Law) (730 ILCS 152/101 *et seq.* (West 2016)), as well as dispersed statutory sections prohibiting sex offenders' presence in or around schools and parks (720 ILCS 5/11-9.3 (West 2016)), prohibiting sex offenders' petition for a name change (735 ILCS 5/21-101(b) (West 2016)), and requiring sex offenders to renew their driver's license annually (730 ILCS 5/5-5-3(*o*) (West 2016)).

¶ 49                                        A. Punishment

¶ 50       The eighth amendment to the United States Constitution prohibits the imposition of "cruel and unusual punishments." U.S. Const., amend. VIII. "The concept of proportionality is central to the Eighth Amendment." *Graham v. Florida*, 560 U.S. 48, 59 (2010). The proportionate penalties clause of the Illinois Constitution dictates that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Both constitutional provisions explicitly reference punishment or penalties. Thus, the first step in a constitutional challenge under these provisions is to determine whether the statute—or, in this case, statutes—actually impose a punishment or penalty that would be subject to constitutional restrictions.

¶ 51       In 2000, our supreme court concluded that neither SORA nor the Notification Law constituted punishment such that they implicated the eighth amendment or the proportionate penalties clause. *People v. Malchow*, 193 Ill. 2d 413, 421, 424 (2000). However, the statutory scheme has been amended numerous times since *Malchow*, with additional requirements and restrictions placed upon sex offenders. Defendant contends that the exponential growth of the statutory scheme renders the *Malchow* decision stale and argues that this court should conduct a new inquiry into whether that statutory scheme is *now* punitive in nature.

¶ 52       Recently, this court in *People v. Tetter*, 2018 IL App (3d) 150243, ¶ 45, described the post-*Malchow* evolution of SORA:

           "[The legislature has] imposed specific restrictions on where sex offenders may be present or live. See 720 ILCS 5/11-9.3, 11-9.4-1 (West 2012). Sex offenders cannot have jobs where they work, at any time for any reason, within 500 feet of a school or public park or within 100 feet of a school bus stop. *Id.* SORA also effectively bars offenders from working any job requiring extensive travel; sex offenders must notify, in person, both Illinois law enforcement and the destination's law enforcement when they are away from home for three or more days. 730 ILCS 150/3(a) (West 2012). The amendments since *Malchow* 'directly restrict where [a sex offender] can live,

work, and even move about his community.' *People v. Avila-Briones*, 2015 IL App (1st) 132221, ¶ 51. Thus, we are faced with very different and more restrictive statutes than those addressed in *Malchow* ***."

More recently, in *People v. Kochevar*, 2018 IL App (3d) 140660, ¶ 56, a different panel of our court concluded that the court's duty to reevaluate challenged legislation "is triggered in a situation such as this in which a claim has been raised that statutes deemed civil and regulatory appear to have evolved and become penal."

¶ 53 In turn, both the *Tetter* and *Kochevar* courts embarked on sweeping analyses of whether the statutory scheme, as presently constituted, qualifies as punishment triggering eighth amendment and proportionate penalty clause restrictions. *Tetter*, 2018 IL App (3d) 150243, ¶¶ 47-69; *Kochevar*, 2018 IL App (3d) 140660, ¶¶ 56-63. As part of that analysis, the *Tetter* court pointed out that several other states have recently found that sex offender registration statutes do constitute punishment. *Tetter*, 2018 IL App (3d) 150243, ¶ 69 (citing *Doe v. Department of Public Safety & Correctional Services*, 62 A.3d 123 (Md. 2013), *Gonzalez v. State*, 980 N.E.2d 312, 321 (Ind. 2013), *Starkey v. Oklahoma Department of Corrections*, 2013 OK 43, 305 P.3d 1004, *State v. Letalien*, 2009 ME 130, 985 A.2d 4, *State v. Williams*, 129 Ohio St. 3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, and *Commonwealth v. Baker*, 295 S.W.3d 437 (Ky. 2009)). Ultimately, the *Tetter* court concluded: "Although the sex offender statutes' restrictions may present fair and just punishment in many or most cases, they nonetheless constitute punishment. Most notably, sex offender statutes punish sex offenders by restricting their liberty to live where they wish and move about the community." *Id.* Applying the same analysis, the *Kochevar* court reached the same conclusion, finding that "the sex offender statutory scheme has morphed from civil regulation into something that is indeed punitive." *Kochevar*, 2018 IL App (3d) 140660, ¶ 63.

¶ 54 The analyses in *Tetter* and *Kochevar* were exhaustive, and they obviate the need for a third panel of this court to submit its own unique opinion on the matter. We wholly adhere to the logic and conclusions set forth in *Tetter* and *Kochevar* and find that statutory scheme of lifetime penalties to which sex offenders are subjected constitutes punishment under the eighth amendment and proportionate penalties clause. We now address whether this defendant's punishment is unconstitutionally disproportionate as applied to him.

¶ 55                                     B. Proportionality

¶ 56 The eighth amendment prohibition on cruel and unusual punishment " 'forbids only extreme sentences that are grossly disproportionate to the crime.' " (Internal quotation marks omitted.) *Graham*, 560 U.S. at 60 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997, 1000-01 (1991) (Kennedy, J., concurring in part and concurring in the judgment, joined by O'Connor and Souter, JJ.)). Similarly, a challenge brought under the proportionate penalties clause "contends that the penalty in question was not determined according to the seriousness of the offense." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). At least in this regard, the proportionate penalties clause is synonymous with the eighth amendment's cruel and unusual punishment clause. *Id.* at 517.

¶ 57 In *Tetter*, this court found, as a matter of first impression, that a proportionality challenge to the statutory scheme applicable to sex offenders is best addressed under the three-factor inquiry set forth in *Solem v. Helm*, 463 U.S. 277, 290-92 (1983). *Tetter*, 2018 IL App (3d) 150243, ¶ 73; see also *Kochevar*, 2018 IL App (3d) 140660, ¶ 64 (applying the same test).

We adhere to that conclusion and adopt the same approach here. We begin by considering the gravity of the offense in conjunction with the harshness of the penalty. *Solem*, 463 U.S. at 290-91. We then consider whether "more serious crimes are subject to the same penalty or to less serious penalties" as an indication that the punishment is excessive. *Id.* at 291. As the third factor, the *Solem* Court found that "courts may find it useful to compare the sentences imposed for commission of the same crime in other jurisdictions." *Id.* at 291-92. In *Tetter*, however, this court reasoned that the third *Solem* factor is of little value in the present context because "sex offender statutes' restrictions and offenders' prison sentences vary, sometimes dramatically, by state." *Tetter*, 2018 IL App (3d) 150243, ¶ 73.

¶ 58    Defendant was convicted of criminal sexual assault, a Class 1 felony. 720 ILCS 5/12-13(a)(4), (b)(1) (West 2010).[5] Only aggravated criminal sexual assault (720 ILCS 5/11-1.30 (West 2016)) and predatory criminal sexual assault of a child (*id.* § 11-1.40), both Class X felonies, are *per se* categorized as greater offenses in Illinois.[6] In contrast, many more felony offenses categorized as a lesser degree are subject to SORA requirements. *E.g.*, *id.* § 10-5.1(g)(1) (Class 4 luring of a minor); *id.* § 11-25(b) (Class 4 grooming); *id.* § 11-18.1(c) (Class 2 or 3 patronizing a minor engaged in prostitution). The commission of certain misdemeanor offenses may also subject an offender to SORA requirements. *E.g.*, *id.* § 11-9.1(a), (c)(1) (Class A sexual exploitation of a child); *id.* § 10-5.1(b), (g)(2) (Class B luring of a minor).

¶ 59    Under SORA, convictions for certain enumerated offenses trigger the "sexual predator" designation, through which offenders are made subject to the SORA requirements for life. 730 ILCS 150/2(E)(7) (West 2016). Even within this select group of offenses, criminal sexual assault is still not the least serious offense, as the list includes misdemeanor offenses (720 ILCS 5/10-5.1(b), (g)(2) (West 2016)) and lesser felonies (*id.* § 11-1.60(a), (g)). In short, numerous lesser offenses are subject to SORA, and even some lesser offenses are subject to SORA's sexual predator designation. It is simply indisputable that defendant has been convicted of one of Illinois's most serious sex offenses.

¶ 60    A qualitative look at defendant's offense is of no help to defendant's argument. Defendant was 40 years old when he performed oral sex on a sophomore girl at Lincoln-Way Central. Moreover, it was only because defendant was an assistant coach on S.G.'s bowling team that defendant was in a position to commit that offense. This exploitation of a "position of trust, authority, or supervision in relation to the victim" is considered particularly egregious by the law. *Id.* § 11-1.20(a)(4). Indeed, it was this factor that rendered defendant's actions a Class 1 felony. *Id.* § 11-1.20(b)(1).

¶ 61    To put defendant's conduct in context, it is helpful to consider the two recent cases in which this court found the statutory scheme in question to be unconstitutional as applied. In

---

[5]The criminal sexual assault statute has since been renumbered. See 720 ILCS 5/11-1.20(a)(4) (West 2016). The offense is now, as it was in 2010, a Class 1 felony. *Id.* § 11-1.20(b)(1). For comparison purposes, we will cite the most recent edition of the Criminal Code of 2012, as it would be most reflective of "our community's evolving standard of decency." *People v. Miller*, 202 Ill. 2d 328, 340 (2002).

[6]Certain convictions for child pornography or promoting juvenile prostitution may rise to the level of a Class X felony, depending on the factual circumstances underlying the conviction. 720 ILCS 5/11-20.1(c), (c-5) (West 2016); *id.* § 11-14.4(a)(3), (d).

*Tetter*, the defendant was 21 years old when he met the victim, with whom he was close in age, on a social networking website. *Tetter*, 2018 IL App (3d) 150243, ¶¶ 1, 5. The two eventually entered into a consensual sexual relationship. *Id.* ¶ 8. That relationship continued after the defendant learned that the victim was actually 16 years old. *Id.* ¶ 9. The victim's mother alerted authorities after she learned that the victim had become pregnant. *Id.* ¶ 13. The defendant was convicted of aggravated criminal sexual abuse, a Class 2 felony. *Id.* ¶ 5. The circuit court sentenced him to 180 days in the county jail. *Id.* ¶ 21.

¶ 62    In *Kochevar*, the defendant was 16 years old when he entered into a relationship with the 14-year-old victim. *Kochevar*, 2018 IL App (3d) 140660, ¶ 4. The defendant and the victim attended high school together. *Id.* Sometime after the defendant turned 18 years old, the relationship became sexual in nature. *Id.* Upon learning of the relationship, the victim's parents alerted authorities. *Id.* The defendant was charged with and convicted of misdemeanor criminal sexual abuse. *Id.* ¶ 1. The court sentenced defendant to 90 days in jail (with all but 10 days suspended) and 24 months' probation. *Id.*

¶ 63    While the defendants in *Tetter* and *Kochevar* were young men engaged in criminal sexual relationships with girls slightly younger than themselves, defendant here was 25 years the victim's senior.[7] Further, defendant took advantage of his position of trust and authority over S.G., a fact not present in *Tetter* or *Kochevar*. On a fundamental level, defendant's conduct in the present case is more offensive to "our community's evolving standard of decency." *People v. Miller*, 202 Ill. 2d 328, 340 (2002). This conclusion is reflected in the sentencing ranges in each case; while the sentences in both *Tetter* and *Kochevar* were measured in days in the county jail, defendant was sentenced to six years' imprisonment, two years above the minimum for a Class 1 felony. See 730 ILCS 5/5-4.5-30(a) (West 2014).

¶ 64    In attempting to minimize the gravity of his offense on appeal, defense emphasizes that "there was no force used in the alleged incidents[ ] and there was only one victim." Initially, we note that criminal sexual assault is a Class 1 felony whether it is the result of the use of force or the result of an older person taking advantage of their position of trust or authority over a minor (see 720 ILCS 5/11-1.20 (West 2014)), belying defendant's implication that his offense is inherently less serious in nature than forcible assault. Further, the fact that there was only one victim does nothing to diminish the seriousness of the offense, it merely means that defendant only committed one offense, rather than two or three.

¶ 65    While defendant's offense was serious, we must also be careful not to downplay the severity of the punishment defendant faces. As a sexual predator, defendant is subject to a lifetime of SORA and the Notification Law requirements, among other restrictions. As the *Kochevar* court described, defendant "faces a lifetime of employment rejection, public disdain, impairment of his enjoyment of parental involvement and his discharge of parental responsibilities, curtailment of his liberty to live where he chooses and to move freely about his community, suspicion, and permanent stigma." *Kochevar*, 2018 IL App (3d) 140660, ¶ 49.

¶ 66    Nevertheless, we cannot conclude that the punishment is grossly disproportionate to the offense in this case. Defendant's offense was among the most serious sex offenses that can be

---

[7]The notion that the offender's age and the difference in ages, rather than just the victim's age, bears on the seriousness of an offense is reflected in certain criminal sex crime statutes. See, *e.g.*, 720 ILCS 5/11-1.50(b), (c) (West 2016); *id.* § 11-1.60(d); *id.* § 11-6.6(b).

committed in the State of Illinois. While some greater offenses are subject to the same statutory scheme pertaining to sex offenders, many *lesser* offenses are subject to that same scheme. As applied to defendant, the statutory scheme including SORA and the Notification Law comports with the eighth amendment to the United States Constitution, as well as the Illinois Constitution's mandate that all penalties be determined according to the seriousness of the offense.

¶ 67     In reaching this conclusion, we are mindful of defendant's assertion that his classification as a sexual predator, and the resultant disabilities and restraints, involved "no consideration of rehabilitative potential or restoration to useful citizenship." To that point, defendant repeatedly stresses that the instant case was his first criminal conviction of any kind and that he had previously lived a law-abiding life. He also urges that "the positive aspects of the sex offender report[ ] strongly suggest that the offenses Defendant was convicted of here are unlikely to recur."

¶ 68     Those facts—namely, defendant's lack of criminal history and his claimed low risk of recidivism—do not bear on the seriousness of the instant offense, but on defendant's rehabilitative potential. The sexual assault of a minor is not somehow a less egregious offense if it is simply the first time that particular offender has sexually assaulted a minor. For that reason, we construe defendant's argument based on those facts as a separate challenge to the second portion of the proportionate penalties clause. Of course, in addition to requiring penalties to be determined according to the seriousness of the offense, the proportionate penalties clause mandates that penalties also be issued "with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; see also *Sharpe*, 216 Ill. 2d at 524-25 (dividing proportionate penalties challenge into distinct sections corresponding with the proportionate penalties clause). Our supreme court has consistently considered the two proportionate penalties clause requirements separately. *E.g.*, *People v. Coleman*, 166 Ill. 2d 247, 261 (1995).

¶ 69     To be sure, defendant's history and character are primary considerations when evaluating a defendant's rehabilitative potential. *E.g.*, *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010). Further, it stands to reason that a defendant's relative risk of recidivism is also a proper consideration, as one less likely to reoffend must have a greater chance of restoration to useful citizenship. However, the nature and circumstances of the offense are themselves factors to be considered in the determination of rehabilitative potential. *Id.*

¶ 70     While defendant certainly had an unblemished record prior to committing the present offense, his risk of recidivism is far less clear. Defendant posits that "the positive aspects of the sex offender report[ ] strongly suggest that the offenses Defendant was convicted of here are unlikely to recur." The "negative aspects" of that report, such as the conclusions that defendant suffered from a "very severe character pathology" and had "deeply ingrained dysfunctional personality patterns" suggest a different story. Most importantly though, the sex offender report is equivocal. The report itself cautions that the test findings were of "questionable validity" on the grounds that defendant provided such an extreme set of "fake good" answers so as to present himself in an unrealistically positive manner. The report concludes that the use of the results for purposes other than clinical screening could be "misleading." Indeed, even defendant on appeal concedes that "the sex offender evaluation may not be entirely valid."

¶ 71    The very serious nature of the offense, defendant's history and character, and the sex offender report provide varying accounts of defendant's rehabilitative potential. It should also be noted that even when one is mandatorily subjected to the sex offender statutory scheme, the circuit court may still tailor its actual sentence to the defendant's rehabilitative potential. Here, presumably based upon the objective of restoring defendant to useful citizenship, the circuit court sentenced him to 6 years' imprisonment when he was eligible for up to 15 years. We conclude that the record fails to demonstrate that defendant is of such great rehabilitative potential that his classification as a sexual predator, with the ensuing requirements and disabilities under SORA and the remainder of the statutory scheme, rendered the circuit court unable to fashion a sentence that properly contemplated the objective of restoring defendant to useful citizenship.

¶ 72    In summary, the statutory scheme applicable to sex offenders, including defendant's classification as a sexual predator, is not unconstitutional as applied to defendant under the eighth amendment to the United States Constitution. Nor is that statutory scheme unconstitutional as applied to defendant under the Illinois Constitution's requirement that penalties be determined according to the seriousness of the offense. Finally, the statutory scheme is not unconstitutional as applied to defendant under the Illinois Constitution's requirement that penalties be determined with the objective of restoring the offender to useful citizenship.

¶ 73    The judgment of the circuit court of Will County is affirmed.

¶ 74    Affirmed.

¶ 75    JUSTICE WRIGHT, specially concurring:

¶ 76    I agree that the circuit court's comments prior to jury deliberations did not serve in any way to hasten the verdict. I also agree that defendant's subjugation to the statutory scheme of lifetime consequences, as a convicted sex offender, is not unconstitutional. For that reason, I concur in the judgment of my respected colleagues.

¶ 77    I write specially, however, because I would follow the holding in *Malchow*, where our supreme court held that the statutory scheme at issue in this appeal is not punitive. This decision has never been overruled. Respectfully, in spite of this court's decision in *Tetter*, I submit our court does not have the discretion to diverge from the holdings of our supreme court. *Rosewood Care Center, Inc. v. Caterpillar, Inc.*, 366 Ill. App. 3d 730, 734 (2006) ("It is well settled that when our supreme court has declared law on any point, only it can modify or overrule its previous decisions, and all lower courts are bound to follow supreme court precedent until such precedent is changed by the supreme court.").

¶ 78    I also write separately because I strongly disagree that the analysis in *Tetter*, on which this court now relies, is exhaustive. In my dissent in *Tetter*, I characterized the outcome in *Tetter* as a "hazy holding." *People v. Tetter*, 2018 IL App (3d) 150243, ¶ 90. My position has not changed. I conclude that the majority in *Tetter* abandoned the controlling precedent established by *Malchow* in an unsupported, conclusory fashion. In *Tetter*, the majority summarily declared that the increasing statutory restrictions imposed on convicted sex offenders enacted after *Malchow* created a license to ignore that longstanding precedent. Yet, the majority in *Tetter* failed to identify any specific legislative changes, enacted after

*Malchow*, that converted the statutory provisions designed to protect the public into unfairly burdensome consequences that punitively restrict the lifestyles of convicted sex offenders.

¶ 79    I presume the legislative changes vaguely referenced by the majority in *Tetter* became effective after our supreme court's 2013 decision in *Cardona*. In *Cardona*, the court restated, explicitly, that sex offender registration "is a regulatory scheme designed to foster public safety." *People v. Cardona*, 2013 IL 114076, ¶ 24; see also *People v. Pepitone*, 2018 IL 122034.

¶ 80    In spite of my own research efforts, I have yet to discover these legislative provisions, effective after the March 21, 2013, holding in *Cardona*, that justify the holding in *Tetter*. In *Tetter*, I disagreed with the majority's rush to become the first reviewing court in Illinois to find the registration requirements and other statutory restrictions for convicted sex offenders have become punitive. After *Tetter*, our court has praised the rationale of *Tetter* in *Kochevar* and now in this decision. Respectfully, I do not share these views of the holding in *Tetter*.

¶ 81    For purposes of this appeal, I fully adhere to the position set forth in my dissent in *Tetter*. I maintain that the legislative provisions vaguely referenced in *Tetter* are regulatory measures designed for public safety. These regulations create informational tools and protective safe zones that allow parents, neighbors, and other members of the public to minimize the risk of becoming the next unsuspecting target of a recidivist sex offender.

¶ 82    In conclusion, I agree with the result in this appeal on all issues. However, I conclude defendant's subjugation to the statutory scheme of lifetime consequences as a convicted sex offender is not unconstitutional because those consequences are regulatory, protective, and nonpunitive.