FILED

12/27/2023

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 24, 2023 Session

**STATE OF TENNESSEE v. ROBERT J. WHITTENBURG**

**Appeal from the Circuit Court for Bledsoe County**
**No. 18-CR-31    Thomas W. Graham, Judge**

_____

**No. E2022-01342-CCA-R3-CD**
_____

A Franklin County jury[1] convicted Robert J. Whittenburg, Defendant, of two counts of first degree premeditated murder. After a sentencing hearing, the trial court imposed two consecutive life sentences. On appeal, Defendant argues: (1) the State did not present sufficient evidence of premeditation; (2) the trial court improperly denied Defendant's request for a special jury instruction on premeditation; (3) the trial court improperly addressed concerns about irregularities during jury deliberations; and (4) the trial court impaired the jury when it briefly prohibited smoke breaks and then changed its mind. After review, we affirm the judgments of the trial court but remand the case for resolution of procedural issues related to the change of venue and entry of revised judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TOM GREENHOLTZ, JJ., joined.

Samuel F. Hudson, Dunlap, Tennessee, for the appellant, Robert J. Whittenburg.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas (at oral argument) and Jonathan H. Wardle (on brief), Senior Assistant Attorneys General; J. Michael Taylor, District Attorney General; and David Shinn and Steven Strain, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] Defendant's case originated out of Bledsoe County, but Defendant was granted a change of venue and a Franklin County jury heard the case.

**OPINION**

## I. Background and Procedural History

On November 30, 2017, the victims, Dedra Lawrence and her mother, Deanna Lawrence,[2] were discovered by Deanna's boyfriend, Jeffrey Seals, at Defendant's house in Bledsoe County. Mr. Seals also found Defendant lying in his bed, covered in blood, and appearing to be dead. After Mr. Seals called 911, responding police officers discovered a gruesome scene. Both women were dead, and their bludgeoned bodies were covered with multiple wounds, including "chop wounds."[3] On top of Dedra's body, officers found a two-page note that read, "I loved her [so] much," and was signed "Joe." When officers checked on Defendant, they discovered he was alive and taking shallow breaths. Officers had Defendant transported to the hospital before taking him into custody. The Bledsoe County Grand Jury indicted Defendant on two charges of first degree premeditated murder.

Before trial, Defendant moved for a change of venue, which the trial court granted. In its order granting the change of venue, the trial court wrote, "The venue in this matter shall be moved to Franklin County, [Tennessee] for the trial to be conducted in Franklin County with a jury comprised of people from Franklin County." The trial was held in Franklin County with a jury comprised of Franklin County citizens, but the Bledsoe County Circuit Court Clerk did not copy and transmit the case file to Franklin County, as required by Tennessee Rule of Criminal Procedure 21(e)(1). All trial court orders following the trial court's grant of change of venue were filed by the Bledsoe County Circuit Court, and the judgments were filed with the Bledsoe County Circuit Court Clerk. For the reasons below, we address this issue even though neither party addresses this oversight on appeal.

We observe that the Tennessee Supreme Court has long held that when a defendant seeks and is granted a change of venue, the defendant waives his rights as to venue and "vicinage," or the place from which jurors are summoned. *See State v. Nichols*, 877 S.W.2d 722, 728 (Tenn. 1994) (citing Tenn. Const. art. I, § 9). Similarly, we conclude that the grant of a change of venue waives a defendant's potential procedural or jurisdictional challenges based on a trial court's failure to follow the procedures set forth in Rule 21(e). Accordingly, this court will consider Defendant's appeal on its merits. However, we remand this case to the trial court for compliance with Tennessee Rule of Criminal

---

[2] Because the victims share the same surname, they will be referred to by their first names. We intend no disrespect.

[3] Dr. Emily Dennison, a forensic pathologist who testified at trial, defined a chop wound as a wound in between sharp force injuries and blunt force injuries. A sharp force injury is a wound caused by "a sharp instrument like a knife[,]" whereas a blunt force injury may be caused by an item such as a "baseball bat." A chop wound may be inflicted by an "item that is heav[y]" with a "sharp blade."

Procedure 21(e). The Bledsoe County Circuit Court shall transfer the trial court case file to the Franklin County Circuit Court, and the Franklin County Circuit Court shall issue revised judgments reflecting it as the trial court of record. However, the Franklin County Circuit Court need not file a duplicate copy of the record with the Appellate Court Clerk.

## II. Trial

Jeffrey Seals testified for the State and explained that at the time of the victims' deaths, he lived with Defendant and both victims. Mr. Seals explained that Defendant had lived in the home for a few months, and Defendant appeared to be "very much in love with Dedra." Mr. Seals also explained that Dedra and Defendant argued a lot, and on more than one occasion, Defendant said "Jeff, I'm going to kill her."

On November 30, 2017, Mr. Seals arrived home around 7:00 p.m. after being out of town for work. The last time he spoke with Deanna was the night of November 29, and despite his efforts, he was unable to reach Deanna, Dedra, or Defendant on November 30, which he found unusual. Mr. Seals tried to open the door to his home, but it was locked and he did not have his key. He knocked on the door for an hour before walking to the back of the house to knock on Dedra and Defendant's bedroom window. Mr. Seals broke a window, and after entering the house, he saw Defendant lying on a mattress. Mr. Seals recounted his encounter with Defendant:

> His face was blue and I shook his legs trying to—and called his name trying to wake him up. When I shook his legs, his face was blue and I realized something was terribly wrong when I shook him, because he's [sic] head was bobbling and the color of his skin and then I saw . . . the bloody rags all along the edge of the bed.

Mr. Seals went to his and Deanna's bedroom and found nothing amiss, so he walked to the kitchen. There he stumbled upon Dedra's body. Mr. Seals stated, "I knew she was gone. I knew she was [lying] on the floor and she was gone." Mr. Seals tried to leave the house from the kitchen door:

> I had to move [Dedra's] leg to get out, because it was blocking the door where I couldn't open it, and ran out the door and when I got down to the bottom of the steps of the porch I realized that Deanna was probably in there[] too, and I turned around and ran back and I ran in the living room and turned the light on and she was lying there in the floor also, in the living room floor.

Mr. Seals "panicked" and immediately ran out of the house to call 911.

Mr. Seals was shown a picture of Defendant's fire axe, which was later found in Defendant's bedroom. Mr. Seals identified the axe as Defendant's, and said Defendant normally kept the axe in a corner of the kitchen.

Officer Ricky Hodge with the Pikeville Police Department was the first police officer to arrive at the house on November 30, 2017. Officer Hodge described Mr. Seals as frantic as he ran across the yard screaming, "they're all dead[!]" Officer Hodge and another officer entered the house, and because there was so much blood on the floor, the officers had to hold on to each other to keep from sliding. Officer Hodge found a woman's body in the kitchen and another woman's body in the living room. As they continued to clear the house, they found Defendant on a bed, appearing to be dead. Officer Hodge then discovered that "[Defendant] was taking very shallow breaths." After Emergency Medical Services took Defendant, Officer Hodge began "setting up a perimeter and crime scene tape . . . so nobody else could come in, and got in contact with [his] chief." After agents with the Tennessee Bureau of Investigation (TBI) arrived, Officer Hodge turned the investigation over to them.

Special Agent Leo Andy was one of the TBI criminal investigators who collected evidence at the crime scene. He testified that while he was in Defendant's kitchen, he collected samples of blood from the wall, the sink, the counter, and a blue glove. He also identified blood on the wall of the living room and collected samples from the coffee table and the carpet. Agent Andy identified a photo of a bag filled with "medical supplies" including a rubber glove "consistent with the rubber gloves" found in the kitchen. He stated that when he turned Deanna's body over, he found "loose hair on her body." He then identified a knife and box cutter that were found on a shelf in Defendant's bedroom where the axe was also found.[4] The agent testified that what appeared to be hairs were also found on the axe. He also identified a photograph of a pair of jeans with blood on them that was found in Defendant's bedroom. Agent Andy testified that he found no other weapons near the victims' bodies, nor did he find an ashtray near Dedra.

Special Agent Jennifer Spivy, a TBI forensic scientist in the latent print unit, examined the two-page note from the residence for the presence of fingerprints. Agent Spivy did not find any fingerprints on the note, but she explained that was not unusual:

[O]ne, the person could be wearing gloves. There are environmental factors that come into play. The item itself might not lend itself well to laying down a latent print. There could be too much handling, too little handling.

---

[4] Although Agent Andy testified that the axe was collected from the crime scene, he did not testify specifically whether he or one of the other TBI investigators collected the axe. If such information was noted on an evidence tag attached to the axe or the box in which it was presented at trial, such information is not in the appellate record, as the trial court clerk retained the axe.

- 4 -

Conditions of skin. [There are] just many different reasons why fingerprints might not be left behind.

Agent Spivy also examined the fire axe taken from the scene and found only "a few ridges with no details, so [she] could not do any type of comparison with those." Agent Spivy explained she needed "a certain . . . quality of those latents . . . to have enough information . . . in order to do a comparison," but here "[t]here were only a few ridges. There was no detail in any of those ridges . . . to do anything with." She noted it was normal not to find fingerprints on the surface of an axe. She also found hair on the axe but did not test it because the TBI did not test hair at that time.

Special Agent Keith Herron, the TBI's lead agent on this case, conducted a recorded interview with Defendant at the Bledsoe County Sheriff's Department on December 4, 2017. After advising Defendant of his *Miranda* warnings, Defendant agreed to speak with Agent Herron. During the interview, Defendant's arm was bandaged. Defendant admitted he went by the nickname "Joe." Defendant said he worked in construction installing "guardrails," and he had previously worked for the fire department in Van Buren County. Defendant said he had completed training as an advanced emergency medical technician (EMT) at Chattanooga State Community College, but he no longer worked as an EMT. Agent Herron asked Defendant to explain the events leading to the incident, and Defendant responded, "It's hard to say, I don't remember a lot of it." Agent Herron then asked if there was an argument on November 30 to which Defendant acknowledged there was "[a] little argument" and a "small disagreement" with Dedra, but Defendant asserted that it was "nothing spectacular." When asked specifically what Defendant and Dedra were arguing about, Defendant said it was "[s]tupid stuff." Dedra found a few pieces of mail in the trash with the phone number and names of "Sally Kirby" and "Katrina." Defendant said that "Sally" was a man he had known "all [his] life," and "Katrina" was his aunt. Dedra wanted to know why Defendant had thrown them away, and Defendant explained he did not need them. Defendant said that Dedra also was angry about "some numbers calling from [the] 615 area code . . . and we'd been working around Nashville, so [Dedra] trie[d] to put two and two together" and thought Defendant was seeing another woman. But Defendant stated, "[I]t wasn't a big argument, it was just a disagreement . . . and [Dedra] threw an ashtray at me," but the ashtray did not hit him. Defendant said "I think she hit me with her fist. . . . And some way or another . . . I got these bruises." He later said Dedra "busted [his] lip." At that point, Defendant "shoved [Dedra] back," and "Deanna started in." He stated that Deanna said, "I'm calling the law. Y'all get your sh** and get out of here."

Defendant admitted to consuming "about two swall[ows] of liquor" before the argument, but not enough "where [he] wouldn't remember what [he] was doing." Defendant denied taking any drugs before the argument. Defendant believed Deanna called Dedra's dad, Mario, and told him about the fight, saying she "couldn't put up with

- 5 -

it" while Mr. Seals was out of town. When Defendant was asked whether he and Deanna were arguing, he said "[n]o, not really."

Defendant said "that's about all I remember. Then I remember I was standing between the living room and the kitchen and they're [lying] dead. . . . [With] Dedra dead over here and Deanna dead over here." During the argument, Defendant said he was still wearing his work clothes, which were a T-shirt, blue jeans and work boots. After he saw the victims' bodies, Defendant said he noticed he was in the shorts he wore "to bed," but he saw his jeans on the floor which were "pretty bloody." He said "it had to be me that d[id] it." He also did not recall writing the note or placing it on Dedra's body, but admitted he saw the note resting on her body. Defendant acknowledged the note was written in his handwriting and signed with his signature.

Defendant said he normally kept his fire axe "on the inside by the back door" of the house. After he realized what he had done, Defendant noticed the axe on the ground beside Dedra so he picked it up and "tried to cut [his] arm off with it" in his bedroom, but he "[m]entally couldn't do it." Eventually, Defendant took a "whack" at his arm and he described it as going numb and said it was still numb during the interview. Defendant said he then tried to "drain" himself by inserting "IVs," but the IVs kept clotting. Defendant said he "didn't want to live" after he saw what he did. Afterward, he took Benadryl, over-the-counter sleeping pills, Gabapentin, three-quarters of a Valium, and about five yellow pills with "4250 Mylon" printed on them, which he believed were "some kind of sedative." Defendant said he hoped he would "die" before anyone found him. Defendant, again, stated that he would have never hurt Dedra because he "loved her so much." He acknowledged, however, he had killed the women because there was "nobody else there." When asked why he killed them, Defendant said he could not "think of anything," and he did not know "why in the hell [he] would have done this." When Agent Herron asked Defendant if he had done things in the past he could not remember, Defendant replied "[n]ever."

Special Agent Charly Castelbuono, a forensic scientist in the TBI forensic biology unit, testified that she received buccal swabs taken from Defendant and blood samples from the victims. Agent Castelbuono tested the note found on Dedra's body for a DNA profile and matched it to Defendant. She then matched blood swabs from the kitchen wall to Dedra; blood swabs from the kitchen table to two individuals, with the major contributor being Defendant; blood swabs from the coffee table to Dedra; and blood swabs from the living room floor to Deanna. Agent Castelbuono also tested multiple items, including the axe, boxcutter, and knife collected from the crime scene, for DNA profiles. Specifically, she found a mixture of Defendant's and Dedra's blood on the handle of the fire axe, Deanna's blood on the axe's blade, and a mixture of Dedra's and Deanna's blood on the axe's claw. Agent Castelbuono's testing indicated Defendant's blood was found on the

handles and blades of the box cutter and knife, and DNA samples taken from elsewhere on the handles of these two instruments (i.e., outside the blood stains) contained a mixture of Defendant's DNA and a profile which could not be identified due to the small size of the samples. Agent Castelbuono did not match any of the blood swabs to anyone else.

Dr. Emily Dennison, a forensic pathologist, performed autopsies on the bodies of Deanna and Dedra. At the time of her death, Deanna was 5'2" tall and weighed 111 pounds.[5] Dr. Dennison explained that Deanna's body arrived wearing only a bra and a pair of pants. The pathologist's testimony explained Deanna's wounds to the jury. Dr. Dennison identified three chop wounds to Deanna's head. One wound was "a chop wound to the left side of the scalp," on the front of the victim's head. This wound penetrated the temporalis muscle, located atop the scalp, and it also penetrated Deanna's skull and the left cerebral hemisphere of her brain. Dr. Dennison acknowledged this wound would have been fatal. Dr. Dennison stated Deanna also suffered two chop wounds to the back of the scalp. These wounds penetrated Deanna's skull but did not penetrate her brain, so these wounds, by themselves, would not necessarily have been fatal. Dr. Dennison testified that Deanna also suffered a wound to the back of her neck; this wound was over two inches deep and severed both the brain stem and the ligament attaching the skull to the cervical spine. The pathologist testified this wound was nearly immediately fatal. She also testified that Deanna suffered several other non-fatal injuries, including a stab wound to her left knee, facial lacerations, bruises on the torso and extremities, and abrasions to the torso. Dr. Dennison opined that all of Deanna's injuries occurred while she was still alive. Deanna also tested positive for amphetamine, methamphetamine, and tetrahydrocannabinol (THC).

Dr. Dennison then testified about Dedra's autopsy. At the time of her death, Dedra was 5'2" tall and weighed 119 pounds. Dedra suffered seven chop wounds, nine stab wounds, and three incised wounds. She had stab wounds on her face, the top of her head, her left arm, and a line of six punctures up the side of her back and neck. Six of the chop wounds were to her head, with four of the wounds penetrating the scalp and one of these four wounds penetrating her brain. Dr. Dennison testified that Dedra also suffered a chop wound to the right wrist; the pathologist explained the wound "went through the majority of the soft tissue, the bones, the tendons, [and] the vessels of the right wrist. There was a small amount of skin still intact on the wrist, but the majority of the . . . wrist was almost chopped off[.]" Dr. Dennison testified that both the chop wound that penetrated Dedra's brain and the wound to the wrist could have been fatal; specifically, Dedra could have bled out from the wrist wound absent prompt medical attention.

---

[5] The record does not contain information about Defendant's height and weight at the time of the offense.

The toxicology results showed that Dedra had a blood alcohol concentration of 0.116 percent, and she had methamphetamine, morphine, oxycodone, and THC in her system at the time she died.

Defendant called his mother, Mary Ellen Whittenburg, as a witness. She testified that Dedra and Defendant lived with her for a few months in 2017, and during that time she had an opportunity to observe their interactions. She explained that Defendant "loved [Dedra] very much." She described Defendant's and Dedra's relationship as sometimes good and sometimes not good. On one occasion, Ms. Whittenburg recalled "[hearing] a lot of screaming and things being throw[n] and being throw[n] down [her] stairs, dishes, clothes, shoes, anything that was up there." When Defendant walked downstairs, Ms. Whittenburg observed "a mark on his face" that looked like a "red knot;" she claimed Defendant did not have this mark before he went upstairs. On November 27, 2017, Ms. Whittenburg met with Defendant, who appeared "okay" to her. She recalled Defendant saying "he was tired, he was coming in from work, and he was going home."

Defendant testified on his own behalf. Much of his in-court testimony mirrored what he had told Agent Herron in the December 4, 2017 interview. When Defendant was asked to describe his relationship with Dedra, he replied:

> She was my whole world. She means everything to me. I don't know how I can live without her. I don't know how I've been living without her. We were inseparable when we were together as long as I wasn't at work. We were right in the same room constantly all the time. We couldn't even go out in the yard to walk the dog, both of us had to go.

He stated that Dedra was occasionally aggressive to him, but more often she was as "sweet as could be." Other times, "she was pure heck on wheels. . . . She's punched me in the face. She's threw [sic] me and kicked me off the bed." Defendant denied ever striking Dedra with his fist, and when she would strike him, he would "either try to restrain her or if she was too wiry" he would "walk away." He stated that usually she was difficult to restrain. Regarding Dedra and Deanna's relationship, Defendant stated:

> They got along most of the time, but when they'd fight it was pretty bad. . . . [O]ne time Deanna was having Dedra highlight her hair and she said, "You're pulling my hair." And then Dedra got mad and wouldn't do [any]more. She pulled her hair purposely and then walked off.

Defendant said the two women's arguments sometimes became physical; once, Dedra "grabbed Deanna and punched her, started punching her and was punching her in the back as everybody was running out the door and ran her halfway down the street in Pikeville."

Defendant stated that he had never done drugs, but he was trying to help Dedra with her narcotics and opioid addiction and would regularly take her to a Suboxone clinic for treatment.

Defendant described his disagreement with Dedra that occurred on November 28, 2017. He stated that Dedra hit him in the eye, and then Defendant walked away and "gave her a little bit to calm down." Eventually they made up and slept in the same bed. Defendant described the household "mood" the next day as "peaceful" before he went to work:

> I got up, got dressed, kissed Dedra. Always had to wake her up, because she didn't like it if I left without waking her up. Kissed her several times, because I couldn't get away without kissing her several times. She wouldn't let me and I didn't want to. I'd almost be late to work because I couldn't get away from her and didn't want to get away from her, and I walked to work.

He said that he spoke with Dedra several times that day. When he arrived home around 4:00 p.m., Defendant said everything was "fine," and he met Dedra in the kitchen and "kissed . . . and hugged her." According to Defendant, the mood quickly changed:

> [Dedra] wanted to know where the phone numbers went and I told her I[] already threw them away. She punched me in the face. She punched me in the mouth. . . . Deanna came [out] of her room and said that we'd have to get our stuff and get out. She couldn't put up with the fighting and she said she was on the phone with Mario [Dedra's father].

Defendant stated that after Deanna came out of her bedroom and yelled at them, he could not recall anything else. When asked if he planned to harm Dedra that night, Defendant replied, "Never. Never planned to do any harm to her. I never planned to do any harm to her. All I wanted to do was love her and spend the rest of my life with her." He then stated that he did not plan to hurt Deanna either. He stated if he had been "clearheaded" that night he could have successfully taken his life because he "had the training and the tools to do it with. [He] had the meds in [his] bag. . . . [He] could have took [his] life, but [he] wasn't clearheaded enough to even do that."

Defendant admitted to locking the door before Dedra and Deanna were killed, but he said locking the door was something he "normally did." When Defendant was asked if he took responsibility for the women's deaths, he said "I was the only one there. I guess I have to."

On cross-examination, Defendant agreed he and Dedra had more serious fights in the past. Defendant said he did not consume any drugs that would have affected his mind that night, and agreed he "certainly [wasn't] intoxicated," even though there was "a gap" in his memory regarding the night's events. He said before that night, he had never had any issues with his memory. Defendant admitted the fire axe was his, but he said he did not know how Dedra's blood got on the axe. When asked why, as a trained EMT and firefighter, Defendant did not render first aid to the women when he "came to," Defendant answered "[t]here was nothing that could be done."

After deliberating, the jury convicted Defendant of two counts of first degree premeditated murder. Before trial, the State had filed a notice to seek a sentence of life in prison without parole, but the State withdrew the notice during a bench conference held immediately after the verdict was returned. The trial court later held a hearing to consider whether Defendant's two life sentences would be served concurrently or consecutively. After reviewing the presentence report, victim impact statements, and the sentencing hearing testimony of Defendant and his mother, the trial court concluded that consecutive sentences were warranted based on Tennessee Code Annotated section 40-35-115(b)(4): "The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Consistent with the requirements of *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995), the trial court also found that an extended sentence was necessary to protect the public against Defendant's further criminal conduct and that consecutive sentences reasonably related to the severity of Defendant's offenses.

Defendant subsequently moved for a new trial which the court denied after a hearing. This timely appeal follows.

III. Analysis

On appeal, Defendant argues: (1) the State did not present sufficient evidence of premeditation; (2) the trial court improperly denied Defendant's request for a special jury instruction on premeditation; (3) the trial court improperly addressed concerns about irregularities during jury deliberations; and (4) the trial court impaired the jury when it briefly prohibited smoke breaks and then changed its mind.

A. Sufficiency of the Evidence

Defendant argues the evidence introduced at trial was insufficient to support a conviction of premeditated first degree murder. The State contends that the conviction was proper because the evidence suggesting premeditation was overwhelming.

The standard of review to a challenge of the sufficiency of evidence is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). A conviction "removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt," and the defendant bears the "burden of demonstrating that the evidence is insufficient." *State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996).

Appellate courts "should not reweigh or reevaluate the evidence." *State v. Winters*, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003). The appellate court "may not substitute its inferences for those drawn by the trier of fact." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). "Questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence, are resolved by the trier of fact[.]" *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999). The jury "is empowered to assess the credibility of the witnesses, to address the weight to be given their testimony, and to reconcile any conflicts in the proof." *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011).

First degree murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d) (2018). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Tennessee courts "'have long recognized that premeditation may be proved by circumstantial evidence' because 'premeditation involves the defendant's state of mind, concerning which there is often no direct evidence.'" *State v. Morgan*, No. E2018-02245-CCA-R3-CD, 2020 WL 3032878 at *6 (Tenn. Crim. App. June 5, 2020) (quoting *State v. Davidson*, 121 S.W.3d 600, 614-15 (Tenn. 2003)). Our supreme court has identified several specific circumstances that may demonstrate the existence of premeditation:

(1) The use of a deadly weapon on an unarmed victim;
(2) The particular cruelty of the killing;
(3) Threats or declarations of intent to kill;
(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*State v. Reynolds*, 635 S.W.3d 893, 916-17 (Tenn. 2021). This list "is not exhaustive," and "the trier of fact is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *Id.* at 917 (quotation marks omitted).

Defendant argues the evidence presented at trial was insufficient to establish premeditation because the "only evidence that the State presented during the trial of this matter was that [Defendant] had apparently told [Mr.] Seals at some undetermined point in the past that he was going to kill Dedra."

Here, the evidence, when viewed in the light most favorable to the State, showed that Defendant locked the only usable door in the house after he arrived home. Defendant inflicted multiple chop wounds and stab wounds on two unarmed victims during these brutal events. Deanna's body was covered with bruises and scrapes, and she had four chop wounds that she endured while she was still alive, including one which fractured her skull and pierced her brain. Defendant also inflicted a chop wound to the back of Deanna's neck; this wound was over two inches deep and severed her brain stem. Defendant inflicted nineteen wounds—six of which were chop wounds—on Dedra which led to her death. These wounds included a chop wound that penetrated her brain and another that nearly severed her right wrist. Tennessee's appellate courts have affirmed convictions for premeditated first degree murder when faced with evidence that a victim suffered multiple severe wounds. *See, e.g.*, *State v. Reid*, 164 S.W.3d 286, 311 (Tenn. 2005) (That "the victims had suffered deep, penetrating stab wounds to their throats; the stab wounds had been inflicted with enough force to penetrate the victims' spines; the stab wounds had been inflicted with a knife blade several inches long; and the victims bled to death in a secluded area" showed that the defendant "acted with intent and with premeditation."); *see also State v. Davidson*, 509 S.W.3d 156, 199 (Tenn. 2016) ("'[T]he succession of blows, the patently vicious manner of their infliction, the enormity of the cruelty and the horrendous injuries suffered provide further evidence of a wil[l]ful execution of an intent to kill.'" (quoting

*State v. Banks*, 564 S.W.2d 947, 950 (Tenn. 1978))). Further, "[m]ethods of killing that require more time, effort, and intimate contact than the pulling of a trigger on a gun are more consistent with premeditation." *State v. Oeser*, No. M2019-01052-CCA-R3-CD, 2020 WL 7312174, at *7 (Tenn. Crim. App. Dec. 11, 2020) (defendant hit victim in head with mini sledgehammer; victim still "gurgling" after attack, so defendant stabbed victim in stomach) (citing *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013)). In this case, most of the victims' wounds, including the fatal wounds, were inflicted with Defendant's fire axe. From our review of photographs of the axe which were part of the record, the jury could reasonably presume it would take significant mental reflection and physical effort to swing the axe, chop into a human body, extract the axe from the victim's body, and repeat these actions several times.

To the extent that Defendant threatened the victims, Mr. Seals heard Defendant say that he was going to kill Dedra. Defendant used multiple weapons in succession to cause Dedra's death, because while most of her wounds were caused by Defendant's fire axe, a box cutter and knife were also found and Dedra had three incised wounds in addition to the chop and stab wounds. *See State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004) (citing *State v. Bush*, 942 S.W.2d 489, 501-02 (Tenn. 1997)). Regarding whether there was evidence that one of the victims was retreating when killed, testimony from Agent Castelbuono showed that Dedra was bleeding in the living room because her blood was found on the coffee table, and then she was found lying dead in the kitchen. The attack continued in the kitchen because blood spatter covered the walls and door. Defendant admitted Deanna did not provoke him the day of the attack or on any other day. Although Defendant was a trained EMT and firefighter, he rendered no aid to either victim after his actions.

The totality of the evidence was sufficient for a jury to conclude, beyond a reasonable doubt, that Defendant committed the first degree premeditated murders of both victims. Defendant is not entitled to relief on this issue.

## B. Special Jury Instruction

Defendant next argues that the trial court erred when it refused to instruct the jury that "[e]vidence of 'repeated blows' is not sufficient, by itself, to establish premeditated murder." The State argues that Defendant has waived any relief on this issue because the record does not include a written request for this jury instruction.

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *Dorantes*, 331 S.W.3d at 390. "Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness." *State v. Smith*, 492 S.W.3d

- 13 -

224, 245 (Tenn. 2016). However, "[o]ral requests for instructions are not sufficient for an appellate court to place a trial court in error for rejecting a requested jury instruction." *State v. Leath*, 461 S.W.3d 73, 107 (Tenn. Crim. App. 2013) (citing *State v. Mackey*, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982)). If a party wants the trial court to provide a special jury instruction, that party must first provide the court with a written request for the instruction and provide counsel with a copy of the same. *See* Tenn. R. Crim. P. 30(a). Failure to do so will result in waiver of the issue on appeal. *See Leath*, 461 S.W.3d at 106-07; *State v. Winton*, No. M2018-01447-CCA-R3-CD, 2020 WL 1950777, at \*6 (Tenn. Crim. App. Apr. 23, 2020).

We agree with the State that Defendant has waived full appellate review of this issue because the record does not contain a written request for a special jury instruction on premeditation. For that reason, we examine the issue solely to determine whether plain error review is appropriate. The doctrine of plain error only applies when all five of the following factors have been established:

    (a) the record must clearly establish what occurred in the trial court;
    (b) a clear and unequivocal rule of law must have been breached;
    (c) a substantial right of the accused must have been adversely affected;
    (d) the accused must not have waived the issue for tactical reasons; and
    (e) consideration of the error must be "necessary to do substantial justice."

*State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting *State v. Terry,* 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Id.* at 231.

The trial court instructed the jury using the Tennessee Pattern Jury Instruction on first degree murder, which includes a definition of "premeditation." *See* T.P.I.-Crim. 7.01. That instruction accurately reflected the law. *See* Tenn. Code Ann. § 39-13-202(d), (e); *Reynolds*, 635 S.W.3d at 916. Were the trial court to have instructed the jury as Defendant insists, such an instruction would have been an incomplete statement of the law and an impermissible comment on the evidence. *See, e.g.*, *State v. Hollis*, 342 S.W.3d 43, 51 (Tenn. Crim. App. 2011) (trial court's instructing the jury on factors that this court may consider in determining existence of premeditation is an incomplete statement of the law and an impermissible comment on the evidence). We observe that defense counsel argued to the jury, without objection, that the number of the victims' wounds was not evidence of premeditation.

Because the trial court properly instructed the jury on premeditation and Defendant was able to argue his point to the jury, we conclude Defendant has failed to establish that

consideration of the error is necessary to do substantial justice.  Nor has he established that the trial court's jury instructions violated a clear and unequivocal rule of law. Consequently, Defendant is not entitled to plain error relief on this issue.

## C. Jury Deliberations

Next, Defendant argues the trial court "abused its discretion when it refused to grant [Defendant's] Motion for Mistrial after it was discovered that jurors had communicated with a court deputy (deputy) regarding the definition of 'premeditated' while three . . . other jurors were outside of the jury room on a break."

### 1. Background

The record reflects that approximately three hours and fifteen minutes into the jury's deliberations, the trial court brought the parties into the courtroom to advise them:

> [A]t some point, a deputy was reported to have got in a discussion with one member of the jury about the definition of reasonable doubt.  Of course, that puts up a lot of alarms. And they had already sent a question out to me, it's supposed to be in writing but it was through the deputies.  You know, what is the definition of reasonable doubt?  And I just asked the deputy, said, well, you know they have that that's in the charge, so I circled the reasonable doubt part of the charge, and sent it back to [them]. . . .  I don't know how you can even further explain that.   But anyways somebody's troubled about reasonable doubt, and maybe they'll always be troubled but that's a judgment call basically for the jurors after they understand the definition.

The trial court then questioned the deputy, who stated that jurors had asked him about the definition of premeditation:

> I just walked into the break room to assist them with some break stuff, and when I walked in, they just simply said, can you help us with something? And I said, I don't know, what do you need?  I thought maybe they needed snacks or something.  Can you tell us what premeditated means?  And I just kind of [threw] my hands up and I just told [them], I said, that means basically you have to have a little forethought about what you're going to do, and then you do it.  And she said, is that what it means?  And I said, you need to talk to them about that.  And that's basically all that was said.

The deputy stated that some of the jurors had gone on a smoke break with another deputy, and about "eight, or nine, or ten" jurors were present when the above conversation

- 15 -

occurred. Upon questioning by defense counsel, the deputy stated that the jurors "didn't understand what I was talking about," and the deputy denied that the jurors responded to him after his statement. The deputy stated that if the jurors said anything among themselves after his comment, the deputy did not hear what they were saying.

The trial court admonished the deputy for answering the jurors' question and announced its intent to "bring the whole jury in and just find[] out if there's been any harm here." Defense counsel expressed concern over the jurors' "deliberating without all the jurors[.]" When the jury returned to court, the trial court questioned the jurors as a group, asking them such questions as, "[D]oes anybody have a question right now they want the [c]ourt to answer?"; "Are y'all okay as far as your deliberations?"; and "You don't have any major questions on anything about what the law is, right?"—the record does not indicate any of the jurors responded to the trial court's questions. The trial court then instructed the jurors not to deliberate unless all twelve jurors were present, to communicate with court deputies only if the jury needed to take a break, and to present any questions about the law to the trial court in writing. The trial court then asked the jury if there was "anybody deciding the case based on what the deputy told you[.]" The trial court again received no response.

Based on the jury's lack of a response to the trial court's questions, the court determined that the deputy's interactions with the jury did not go far enough to violate Defendant's rights. The trial court told the jury that it was inappropriate for the deputy to talk to them about the definition of premeditation and explained that the jury charge "speaks in great detail to these definitions." The trial court then ordered the jurors to not "follow [the deputy's] answer" but to "[f]ollow the jury instruction."

Defense counsel asked to voir dire the jurors individually about this incident and whether some jurors had engaged in deliberations without all jurors present, during the smoke break. The trial court stated that counsel could ask for individual voir dire after the jurors had rendered a verdict, to which counsel responded, "Okay." Defense counsel moved for a mistrial based on this issue, but the trial court denied the motion. After resuming deliberations, the jury found Defendant guilty as charged. Defense counsel did not renew his motion for a mistrial and did not move the trial court to individually voir dire the jurors about the deputy's interaction with the jury or any deliberations without all jurors present.

## 2. Applicable Law

Defendant's contention raises three issues: the jury's exposure to extrajudicial communications, the potential separation of the sequestered jury in this case, and the jury's

- 16 -

potential deliberations without all members present.  Our supreme court has addressed the issue of extrajudicial communications during deliberations as follows:

> When a trial court learns that an extra-judicial communication between a juror and a third-party has occurred, the court must take steps to assure that the juror has not been exposed to extraneous information or has not been improperly influenced.  In most circumstances, the appropriate first step is to conduct a hearing in open court in the presence of the defendant to place the facts in the record and to determine on the record whether cause exists to find that the juror should be disqualified.  As the Court of Appeals has noted, when misconduct involving a juror is brought to a trial court's attention, "it [is] well within [the judge's] power and authority to launch a full scale investigation by summoning . . . all the affiants and other members of the jury, if need be, with a view of getting to the bottom of the matter, and this, if necessary, upon [the judge's] own motion."

> Because of the potentially prejudicial effect of a juror's receipt of extraneous information, the State bears the burden in criminal cases either to explain the conduct of the juror or the third party or to demonstrate how the conduct was harmless.  Error is harmless when "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."

> When a jury is not sequestered, something more than a showing of an extra-judicial communication between a juror and a third party is required to shift the burden to the State.  There must also be evidence that, as a result of the extra-judicial communication, some extraneous prejudicial fact or opinion "was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors."  Thus, when it is shown that a juror has been exposed to extraneous prejudicial information or an improper influence, a rebuttable presumption arises and the burden shifts to the State to explain the conduct or demonstrate that it was harmless.

*State v. Smith*, 418 S.W.3d 38, 46 (Tenn. 2013) (citations and footnote omitted).

"A party challenging the validity of a verdict must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *Adams*, 405 S.W.3d at 651.  Tennessee Rule of Evidence 606(b) allows a juror to be called to testify "on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, [or] whether any outside influence was improperly brought to bear upon any juror[.]"  Tenn. R.

Evid. 606(b). However, although Rule 606(b) "permits juror testimony to establish the fact of extraneous information or improper influence on the juror[,] . . . juror testimony concerning the effect of such information or influence on the juror's deliberative processes is inadmissible." *Walsh v. State*, 166 S.W.3d 641, 649 (Tenn. 2005).

Here, the record shows the deputy's comments on premeditation exposed at least some (and possibly most) of the jurors to extra-judicial information. The record shows that the nature of the extra-judicial information was prejudicial because the information was communicated by a non-juror and sought to define an essential element of the offense in a way not provided by the jury instructions. *See State v. Adams*, 405 S.W.3d 641, 651 (Tenn. 2013) (identifying an improper outside influence as being an unauthorized communication "about the matter pending before the jury"); *see also Smith*, 418 S.W.3d at 48 n.6 (Tenn. 2013) ("Potentially prejudicial external influences include a juror's communications with non-jurors about the case."). Consequently, the burden, shifted from defense counsel to the State, "to explain the conduct or demonstrate that it was harmless." *See Smith*, 418 S.W.3d at 46.

The totality of the evidence produced at trial was sufficient for the State to rebut any presumption of prejudice. In determining whether the presumption of prejudice created by improper external influence has been rebutted, the reviewing court considers the following:

> (1) the nature and content of the information or influence, including whether the content was cumulative of other evidence adduced at trial; (2) the number of jurors exposed to the information or influence; (3) the manner and timing of the exposure to the juror(s); and (4) the weight of the evidence adduced at trial. No single factor is dispositive. Instead, trial courts should consider all of the factors in light of the ultimate inquiry—whether there exists a reasonable possibility that the extraneous prejudicial information or improper outside influence altered the verdict.

*Adams*, 405 S.W.3d at 654 (footnote omitted).

The record reflects that not all jurors heard the deputy's comment. When the trial court became aware of the communication, it promptly alerted both parties and then questioned the deputy and the jury (as a group) about the extraneous communications. As the State notes in its brief, this was the proper procedure. *See Smith*, 418 S.W.3d at 46. The trial court then instructed the entire jury to disregard anything the deputy may have told it and base its verdicts solely on the law as instructed by the trial court. No juror told the trial court they did otherwise. The jury is presumed to follow the trial court's instructions unless there is "clear and convincing evidence that the jury failed to follow the trial court's instructions." *State v. Harbison*, 539 S.W.3d 149, 163 (Tenn. 2018). And as

examined above, extensive evidence of premeditation was presented during trial. Under these circumstances, there is not a reasonable probability that the deputy's comments altered the jury's verdict. Thus, any error was harmless beyond a reasonable doubt.

Defendant's contention that the sequestered jury was improperly separated is without merit, as those jurors who were not present in the jury room during the deputy's improper communication were taking a "smoke break" accompanied by a deputy. As the State observes in its brief, the modern test for determining whether a jury has been "separated" is "whether a juror passes from the attendance and control of the court officer." *State v. Bondurant*, 4 S.W.3d 662, 671 (Tenn. 1999), *no perm. app. filed*. The jurors in this case may have been physically separated at the time of the extrajudicial communication, but they were under the control of deputies, so there was no "separation" within the meaning of relevant statutes and court rules. *See State v. Bargery*, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *80 (Tenn. Crim. App. Oct. 6, 2017) ("[T]he sequestration rule does not literally require each juror to remain in the presence of the other jurors at all times; rather, the 'real test is whether a juror passes from the attendance and control of the court officer.'" (quoting *Bondurant*, 4 S.W.3d at 671)).

Finally, regarding Defendant's contention that some jurors deliberated when not all jurors were present, Defendant points the court to no authority stating that such actions constitute reversible error. However, as stated above, defense counsel did not question the jurors after returning their verdict, so Defendant has failed to establish that any improper deliberations occurred. Even if the jury's inquiry about the definition of "premeditation" could be considered deliberation, the evidence cited above was more than sufficient to rebut any presumption of prejudice that may have resulted from such actions.

Accordingly, Defendant is not entitled to relief on this issue.

### D. Juror Breaks

Finally, Defendant argues that the trial court erred when it ordered that jurors could not have further smoke breaks during their deliberations. The State contends this issue has no merit because Defendant presented no proof that the jury reached an impasse during deliberations or that any juror felt undue pressure or was impacted by the trial court's limitations on smoke breaks. We agree with the State.

While addressing the deliberation irregularities discussed above, the court told the jury "we're not going to do [smoke breaks] any more" because "breaking the jury apart is dangerous anyway." But after defense counsel repeatedly objected, the court said that it would "amend" its ruling and "authorize a smoke break" when the court thought it "time for them to take a smoke break."

In his brief, Defendant argues, "it is common knowledge as to the adverse effects on smokers when they are deprived of the opportunity to take smoke breaks, especially during particularly stressful endeavors," yet he also acknowledges "there is . . . no Tennessee jurisprudence addressing the question as to whether jurors are entitled to smoke breaks during their deliberations."[6]

"Unless the trial judge's actions cause a jury to reach a verdict in such a manner that it is patently not their free and untrammeled verdict, a new trial will not be granted." *Rushing v. State*, 565 S.W.2d 893, 896 (Tenn. Crim. App. 1977); *see also Kersey v. State*, 525 S.W.2d 139 (Tenn. 1975); *Weston v. State*, 506 S.W.2d 946 (Tenn. Crim. App. 1973). We do not see how a trial court's denial of smoke breaks would cause undue pressure on jurors to reach a verdict that was not "free or untrammeled." We also note that Defendant has presented no evidence, such as the testimony of jurors or court personnel, suggesting that jurors demanded a break from their deliberations and were denied such a request.

In the overall context of the issue, we see nothing to show any judicial misconduct that impaired the jury. Defendant, therefore, is not entitled to relief.

## IV. Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed. We remand the case to the trial court for resolution of issues related to the change of venue, as set forth in this opinion.

_____
MATTHEW J. WILSON, JUDGE

---

[6] As the State notes in its brief, other states addressing this issue have found no error in a trial court's restricting smoke breaks. *See People v. Cetwinski*, 115 N.E.3d 442, 449-52 (Ill. Ct. App. 2018); *State v. Sanders*, 750 N.E.2d 90, 104 (Ohio 2001). At least one jurisdiction has rejected a defendant's claims regarding the adverse effects of denying smokers the opportunity to smoke. *See State v. Elmore*, 857 N.E.2d 547, 565 (Ohio 2006).